UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                  Case No. 17-45621

OLIVIA WISE,                                            Chapter 7

                     Debtor.                        Judge Thomas J. Tucker
_____/

NORMAN WISE,

                     Plaintiff,

v.                                                      Adv. Pro. No. 17-4534

OLIVIA WISE,

                     Defendant.
_____/

DANIEL M. MCDERMOTT,
UNITED STATES TRUSTEE,

                     Plaintiff,
                                                        Adv. Pro. No. 17-4535
v.

OLIVIA WISE,

                     Defendant.
_____/

## TRIAL OPINION

## I. Introduction

       The Defendant in these two adversary proceedings, Olivia Wise, filed a Chapter 7

bankruptcy case on April 14, 2017. In Adversary Proceeding Number 17-4535, the Plaintiff

Daniel M. McDermott, United States Trustee, seeks a judgment denying Defendant's discharge,

based on 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(4)(A) (Counts I and III of Plaintiff McDermott's

Complaint).[1] In Adversary Proceeding Number 17-4534, creditor Norman Wise, who is the Debtor's father, also seeks a judgment denying Defendant Debtor's discharge, based on the same § 727(a) grounds as the United States Trustee, and also based on 11 U.S.C. §§ 727(a)(3), 727(a)(5), and 727(a)(6) (Counts IV through VIII of Plaintiff Norman Wise's complaint). Norman Wise also seeks a determination that the Debtor's debt to him is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6) (Counts I and III of Norman Wise's complaint).[2]

The Court held a joint bench trial on May 22, 2018, June 5, 2018, June 19, 2018, and July 10, 2018. These adversary proceedings are now ready for decision.

The Court has considered all of the evidence and arguments presented by the parties. This includes the testimony of all the witnesses — namely, Norman Wise; Bert Whitehead, IV; Olivia Wise; and Chelsea M. Rebeck. And this includes all of the exhibits, or parts of exhibits, that were admitted into evidence.[3] This Opinion states the Court's findings of fact and conclusions of law.

For the reasons stated below, the Court finds for the Plaintiffs in each adversary proceeding, on Counts I and III of the United States Trustee's complaint and on Counts IV and VI of Norman Wise's complaint. The Court will enter a judgment denying the Defendant's discharge, based on 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(4)(A). The Court will dismiss all

---

[1] Prior to trial, Plaintiff McDermott voluntarily dismissed the other counts in his complaint, Counts II and IV. *See* Final Pretrial Order (Docket # 29 in Adv. No. 17-4535) at 26, ¶ 17.

[2] During the first day of trial, on May 22, 2018, Plaintiff Norman Wise voluntarily dismissed, with prejudice, Count II of his complaint. *See* "Order Granting Plaintiff's Oral Request to Voluntarily Dismiss Count II of Plaintiff's Complaint" (Docket # 88 in Adv. No. 17-4534).

[3] *See* "Court's List of Exhibits Admitted into Evidence During Trial," filed June 20, 2018 (Docket # 103 in Adv. No. 17-4534; Docket # 66 in Adv. No. 17-4535).

2

other counts of Norman Wise's complaint, as moot.

## II. Jurisdiction

This Court has subject matter jurisdiction over each of these adversary proceedings under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). Every claim in each adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(I) and 157(b)(2)(J).

## III. Discussion

### A. Facts

#### 1. The Agreement between Olivia and her father

These adversary proceedings arise out of a pre-petition agreement (the "Agreement") entered into between the Plaintiff Norman Wise ("Norman") and the Defendant Debtor Olivia Wise ("Olivia"), Norman's daughter, regarding property located at 137 South Wilson Avenue, Royal Oak, Michigan 48067 (the "South Wilson Avenue Property"), and property located at 30515 Fairfax, Southfield, MI 48076 (the "Fairfax Street Property"). The Agreement was fully memorialized (according to Norman) or partially memorialized (according to Olivia) in an e-mail exchange between the parties on February 19, 2016.[4] On that day, Olivia sent the following e-mail to Norman:

> From: Olivia Wise [mailto:omwise89@gmail.com]
> Sent: Friday, February 19, 2016 9:53 AM
> To: Norman H. Wise <NWise@qteaml.com>
> Subject: 137 S. Wilson
>
> Hi Dad,

---

[4] *See* PX 20 at 1. (The Court will cite the trial exhibits using this format: "PX ___" for the Plaintiff's exhibits; and "DX ___" for the Defendants' exhibits.

3

Below is a summary of what we discussed.

1. You will quit claim deed the S[outh Wilson] Ave[nue P]roperty to me with a $250,000 note payable by me to you upon the sale of the [South Wilson Avenue P]roperty.

2. After the S[outh] Wilson Ave[nue P]roperty sells, I will purchase the Fairfax St[reet P]roperty from you at the tbd price (est price = S[outh] Wilson Ave[nue] net proceeds - $250,000 - less hold-back for (AC replacement + one year property taxes + one year insurance)). Intent of the hold-back is to allow me one year to get on my feet.

3. Increase the HAI insurance stipend from $1200/month to $1350/month thru November 1, 2016. The increase will cover the cost of [Olivia's daughter's] orthodontist payments.

4. Payment date for the HAI insurance stipend will shift from the 1st of the month to the 20th of the prior month i.e., March 1st payment will be made by February 20th. The intent is to ensure that I have the resources to pay HAP health insurance premium by the 1st of the month.

Please let me know if the above summary is correct.

Thank you for all your help and support. I deeply appreciate it.

Olivia[5]

Later that day, Norman responded:

From: Norman H. Wise
Sent: Friday, February 19, 2016 11:12 AM

---

[5] *Id.* Olivia alleges that, in addition to the deal point nos. 1-4 listed in her e-mail to Norman, there were two more deal points on which she and Norman agreed. Those were: (5) the South Wilson Avenue Property would be promptly transferred to Olivia by Quit Claim Deed; and (6) Norman would be responsible for any tax liability that arose out of the sale of that property. *See* Tr. of Trial on May 22, 2018 (Docket # 73 in Adv. No. 17-4535) at 172-75 (testimony of Olivia); Tr. of Trial on June 5, 2018 (Docket # 72 in Adv. No. 17-4535) at 83-84 (testimony of Olivia). The trial transcripts will hereafter be cited in the following format: "Trial Tr. (Docket # ___) at ___ (testimony of ___)." Unless otherwise specified, the docket numbers are for Adv. No. 17-4535.

4

To: 'Olivia Wise'
Subject: RE: 137 S. Wilson

Livy,

I agree to all elements of the attached memo.

Best Regards,
[signature of "Norman H. Wise"]
Chief Executive Officer
Quality Team 1
Office: 313-867-8000
Cell: 313-790-0021[6]

The transactions outlined in the February 19, 2016 e-mail exchange purportedly would benefit both parties. The idea in entering into the Agreement was to eliminate the tax liability Norman otherwise would incur from a gain on the sale of the South Wilson Avenue Property, while providing Olivia with financial support, health insurance, and a means to purchase the Fairfax Street Property.

Norman hoped to avoid tax liability on the sale of the South Wilson Avenue Property by transferring the property to Olivia before selling it. As a result, Norman would avoid any tax liability, and Olivia would be able to avoid any tax liability by taking advantage of a homeowner's exclusion on the gain of up to $250,000, contained in § 121 of the Internal Revenue Code ("IRC"), 26 U.S.C. § 121. The general rule under that statute, subject to certain qualifications and limited to $250,000 for a single individual,[7] is that:

> Gross income shall not include gain from the sale or exchange of property if, during the 5-year period ending on the date of the sale or exchange, such property has been owned and used by the

---

[6] PX 20 at 1; *see also* PX 22 ("State Court Complaint") at ¶¶ 24-25.

[7] The $250,000 limit is stated in 26 U.S.C. § 121(b)(1).

5

> taxpayer as the taxpayer's principal residence for periods
> aggregating 2 years or more.

26 U.S.C. § 121(a).

When the parties entered into the Agreement, Olivia and her two children were already

living at the Fairfax Street Property. Norman had purchased that property primarily so that

Olivia and her family could live in the Birmingham School District, a school district that Olivia

and Norman believed would best serve the educational needs of Olivia's children.[8]

Olivia previously had lived at the South Wilson Avenue Property with her domestic

partner and Olivia's children. Norman had purchased the South Wilson Avenue Property on or

about September 9, 2011, for Olivia and her family to live in when they moved from California

to Michigan. Norman purchased that property primarily because it was in the Royal Oak School

District; a school district that Olivia wanted her children to attend at that time.[9] Olivia made no

contribution to the purchase of the South Wilson Avenue Property, and lived in that property

rent-free. Norman "paid all [of] the property taxes and homeowners insurance premiums for the

[South Wilson Avenue Property]" and "also paid for approximately $50,000 in improvements to

the property."[10] Norman also paid health insurance premiums for Olivia and the children and

some of Olivia's living expenses.[11]

On October 14, 2013, Olivia and her domestic partner separated and Olivia moved out of

---

[8] *See* Trial Tr. (Docket # 73) at 33, 38-39 (testimony of Norman), 146 (testimony of Olivia); *see also* Trial Tr. (Docket # 72) at 90 (testimony of Olivia).

[9] *See* Trial Tr. (Docket # 73) at 32-33, 37 (testimony of Norman); *see also* PX 22 ("Complaint and Jury Demand") at ¶ 7.

[10] PX 22 ("Complaint and Jury Demand") at ¶¶ 8-10.

[11] *Id.* at ¶ 11.

the South Wilson Avenue Property with her children. After Norman evicted Olivia's domestic partner from the South Wilson Avenue Property, Olivia and her children moved back into that property and lived there until June 2015, when they left permanently and moved into the Fairfax Street Property.[12]

In the spring of 2016, after making some renovations to the South Wilson Avenue Property, Norman listed it for sale.[13] Norman had purchased the Property for approximately $250,000.[14] After Norman received an offer for over $400,000 for the property, it was clear that he stood to make a substantial gain on the sale of it. Norman's certified public accountant, Gary Davison of Davison and Associates, who had a Master's Degree in taxation, suggested that Norman and Olivia engage in the transactions detailed in the Agreement, as a way of eliminating Norman's tax liability for the gain.[15] In an e-mail Norman sent to Gary Davison and Olivia on February 18, 2016, the day before Olivia and Norman entered into the Agreement, Norman expressed his understanding of the transactions that he and Olivia would have to undertake in order for Norman to avoid a substantial tax liability:

> On Thursday, February 18, 2016, Norman H. Wise
> <NWise@qteaml .com> wrote:
>
> Olivia, Gary,
>
> Gary, I am following through with your suggestion of putting the [South] Wilson [Avenue Property] in Olivia's name. Once it is sold, she will use her one-time $250,000 tax credit exemption to

---

[12] Trial Tr. (Docket # 72) at 145-47 (testimony of Olivia).

[13] *Id.* at 147; Trial Tr. (Docket # 73) at 40 (testimony of Norman).

[14] *See id.* at 37 (testimony of Norman); PX 22 ("Complaint and Jury Demand") at ¶ 7.

[15] *See* Trial Tr. (Docket # 73) at 40, 42, 45 (testimony of Norman).

7

reduce the house basis price, therefore eliminating any capital gains tax. She will remit the net funds of the [South] Wilson [Avenue Property] sale, to me.

The tax savings will be significant to me; especially with the $2,000,000 Helm fire claim hanging over my head.

I have contacted Jeff Glover & Associates, the listing agent for [South] Wilson [Avenue Property]; he is having a Quit Claim Deed drafted, specifying Olivia Marie Wise as the owner. It should be completed tomorrow, I shall sign electronically, Olivia will have to sign at the Glover Birmingham office.

I contacted attorney, Jim DeLine and he said; since Olivia occupied the home for a few years, it was perfectly legal to claim the exemption.

Gary is there anything else I have to do concerning this matter?

Best Regards,

Chief Executive Officer
Quality Team I
Office: 313-867-8000
Cell: 313-790-0021.[16]

Olivia, who was also a CPA, and a certified fraud examiner, and who had worked for Gary Davison, expressed some reservations to Norman about whether the Internal Revenue Service (the "IRS") would view the transfer to her of the South Wilson Avenue Property as a "tax dodge, since the sale was initiated before the Quit Claim [Deed] was filed."[17] Olivia had expressed concern that if the IRS disallowed the exemption, *she* would incur tax liability from

---

[16]  PX 20 at 2; *see also* Trial Tr. (Docket # 73) at 45-46 (testimony of Norman) (Norman's understanding based on his discussions with Gary Davison was that "a person gets a one time [$]250,000 deduction on the sale of their house" and he would be "able to shield some portion of that potential gain on the [sale of the South Wilson Avenue Property] based on this type of a transaction[.]").

[17]  PX 21 at 1; see also Trial Tr. (Docket # 73) at 57-59 (testimony of Norman).

8

the sale of the South Wilson Avenue Property.[18]  Norman voiced Olivia's concerns to Gary

Davison on April 22, 2016 in an e-mail, with a copy sent to Olivia:

> From: Norman H. Wise [mailto:NWise@qteam1.com]
> Sent: Friday, April 22, 2016 6:12AM
> To: Gary Davison
>
> cc: omwise89@gmail.com
> Subject: Sale of [South] Wilson [Avenue Property]
>
> Gary,
>
> The purchase agreement  for the [South] Wilson [Avenue Property]
> was signed in early April.  I Quit Claimed the deed to Olivia after
> the [Purchase Agreement] was signed.  The closing date is around
> May 10th.
>
> Olivia has a concern the IRS, will view this transaction as a tax
> dodge; since the sale was initiated before the Quit Claim was filed.
>
> What are your thoughts?
>
> Best Regards,
>
> [signature of ] Norman H. Wise
> Chief Executive·Officer Quality Team 1
> Office: 313-867-8000
> Cell: 313-790-0021[19]

Later on April 22, 2016, in response to Norman's e-mail, Gary Davison wrote:

---

[18]  Simply based on the wording of IRC § 121(a), quoted above, Olivia's ability to claim the gain exclusion appears doubtful, because the statute required Olivia to have "owned and used" the South Wilson Avenue Property for a period "aggregating 2 years or more" before the sale of the property. Olivia had lived in the property for 2 years or more, but she had not owned the property for 2 years or more.  Norman owned the property from 2011 until just before it was sold on May 10, 2016.  There is a limited exception to § 121(a)'s ownership and use requirements, contained in 26 U.S.C. § 121(c), but that exception does not appear to apply here.

The parties have not briefed this tax law issue, and the Court does not need to make any decision on this issue in these adversary proceedings.  So the Court is not deciding this tax issue.

[19]  PX 21 at 1-2; *see also* Trial Tr. (Docket # 73) at 48-49, 57-62 (testimony of Norman).

9

Sent from my iPhone

On Apr 22, 2016, at 8:52AM, Gary Davison
<gary@davisonandassoc.com> wrote:

Norm,

I understand her concern and think it does provide an element of
risk to what we are doing.  However, I believe our position is
defensible because Olivia is the individual that actually lived in the
house and received the benefit of you purchasing the house.  The
house was purchased for her.  You are not a speculative investor in
residential property so you would not have acquired the home but
for her use.  Accordingly, the house was purchased for her but you
had the deed in your name without benefitting from owning the
home.  The proceeds on sale will be used by Olivia to purchase the
[Fairfax Street Property] for her use.  Our argument is quite strong
to defend what you are doing.

I hope this helps.

Gary Davison
Davison & Associates,  CPA's
3250 W. Big Beaver, Suite 540
Troy, Michigan 48084
248 643-0026 ext. 105[20]

After receiving Gary Davison's assurances, Norman responded the next day:

From: Norman H. Wise
Sent: Friday, April 22, 2016 9:25 AM
To: Gary Davison
Subject: Re: Sale of [South] Wilson [Avenue Property]

Thanks Gary, We will proceed to closing as planned.[21]

Norman testified at trial that the only conversation he remembers having with Olivia after

the e-mail exchange with Gary Davison about Olivia's concern about incurring tax liability, was

---

[20]  PX 21 at 1.

[21]  *Id.*

one in which Norman stated that Gary Davison and Olivia had to "work it out."[22]  He explained

that Olivia knew that the transactions were for tax purposes and that "there [are] two CPA's, they

know way more about this than I do.  Let them figure it out and then I'll go with whatever their

recommendation is. . . .  And . . . if it wasn't right, then . . . we wouldn't do it."[23]

Olivia testified at trial that although she was skeptical about the applicability of the

$250,000 exemption to herself, she had read the e-mail exchanges between her father and Gary

Davison, and "was trusting Gary [Davison]" and relying on his opinion regarding the $250,000

exemption being risky but defensible, because "[h]e has a Master's Degree in taxation" and dealt

with those kind of tax issues on a regular basis and she had "never taken a tax class."[24]  Olivia

testified at trial that she also knew that her father had consulted an attorney about the

applicability of the exemption and the attorney had advised him that it was "perfectly fine to be

claiming the exemption."[25]  Despite the assurances of Norman's CPA and his attorney, Olivia

testified that she was still skeptical about the propriety of her claiming the exemption.[26]  Her

understanding was that the key to the exemption being allowed was that "[t]here . . . be a

significant chunk of time between the transfer of the house into [her] name until the time it was

sold to a third party."[27]  For this reason, she regularly would contact her father and tell him that

---

[22]  Trial Tr. (Docket # 73) at 49 (testimony of Norman).

[23]  *Id.*

[24]  Trial Tr. (Docket # 73) at 154-55 (testimony of Olivia); Trial Tr. (Docket # 72) at 87 (testimony of Olivia).

[25]  Trial Tr. (Docket # 73) at 154-56 (testimony of Olivia).

[26]  *Id.* at 155.

[27]  *Id.* at 156.

the deed for the South Wilson Avenue Property had not yet been filed. Norman told her that the Quit Claim Deed had been executed in March.[28]

## 2. The Closing of the Sale of the South Wilson Avenue Property

On May 10, 2016, Olivia attended the closing of sale of the South Wilson Avenue Property. At the closing, Olivia executed a warranty deed in favor of the buyers, a husband and wife, for the purchase price of $400,137.00.[29] Olivia signed a warranty deed even though she says that she had reservations about whether the transfer to her of the South Wilson Avenue Property "was going to be a legitimate transfer."[30] Olivia thought that the transfer to her possibly was not valid, because she was certain that Susan Wise had not been in Michigan when the Quit Claim Deed was signed and notarized, and the signature of Susan Wise on the Quit Claim Deed "was sufficiently different from [the signature of Susan Wise] that [Olivia] knew and had witnessed multiple times."[31] Olivia also signed a Bill of Sale indicating that she was the Seller of the South Wilson Avenue Property; the closing Settlement Statement, showing that Olivia was

---

[28] *Id.* The Quit Claim deed of the South Wilson Avenue Property from Norman and his wife, Susan G. Wise, to Olivia for consideration of $1.00 is in the record at PX 33. The document indicates that it was signed by Norman and Susan Wise on March 9, 2016 and their signatures were acknowledged by a notary public on that date. Although executed on March 9, 2016, Olivia had not seen a copy of it until the closing of the sale of the South Wilson Avenue Property, and the Quit Claim Deed had not yet been recorded on the date of the closing. *See* Trial Tr. (Docket # 72) at 89, 151 (testimony of Olivia). The quit claim deed from Norman and Susan Wise "was recorded with the register of deeds on May 16, 2016 at Liber 49372, Page 71." (*See* Docket # 19 in Case No. 17-45621) at 2, ¶ 2.) The record reflects that the Purchase Agreement was signed on March 25, 2016. (*See* PX 22 ("State Court Complaint") at ¶ 27.) There is no copy of the Purchase Agreement for the South Wilson Avenue Property in the record.

[29] *See* PX 33; *see also* Final Pretrial Order (Docket # 53 in Adv. No. 17-4534) at 7, ¶ 6 (Stipulation of Facts).

[30] Trial Tr. (Docket # 72) at 152 (testimony of Olivia).

[31] *Id.*

12

due $371,819.38 in proceeds from the sale; and other closing documents.[32]  Among the

documents was a Closing Affidavit that Olivia signed, which contained the following statements

"under penalties of perjury:"

> **2.  LAWFUL OWNERS:** THAT they are the true and lawful
> owners in fee of the property described in Commitment File No.
> 90001441.
> . . . .

> 4. **NO INTERVENING MORTGAGES/LIENS:** THAT no other
> persons have any interest, in equity or otherwise, in and to property
> as described in Commitment File No. 90001441 and the deponents
> are not holding title for another in fulfillment of any trust or
> agreement, or for the benefit of any other person, firm, or
> corporation. . . .[33]

At no time during the closing did Olivia express any reservations about proceeding with

the closing.[34]  When asked why she went through with the closing despite her private

reservations, Olivia gave two reasons: (1) she was concerned for the buyers; and (2) she "figured

[that] since [Norman] said everything would be okay, that we would be able to sit down and

work through an agreement."[35]

### 3.  Olivia's receipt and retention of the sale proceeds

After the closing, Norman was in Florida to conduct some business, and Olivia had

agreed to meet him when he returned in a couple of days, so that Olivia could pay Norman

$250,000 of the proceeds she received from the sale, and then purchase the Fairfax Street

---

[32]  PX 33.

[33]  *Id.*

[34]  Trial Tr. (Docket # 73) at 62, 70 (testimony of Norman), 160 (testimony of Olivia).

[35]  *Id.* at 166 (testimony of Olivia).

Property from him.[36]  On May 11, 2016, the day after the closing, Olivia received proceeds in the amount of $371,789.38 from the sale of the South Avenue Property (the "Proceeds"), by a wire transfer into her account with Vibe Credit Union.[37]

Two or three days after the closing according to Norman, or about a week after the closing according to Olivia, when Norman returned to Michigan and tried to collect $250,000 of the Proceeds, Olivia informed him that she had concerns about her tax liability and that he would have to meet with Chelsea Rebeck ("Rebeck"), an attorney she had hired, before she would give him any of the Proceeds.[38]  In addition to being an attorney, Rebeck also is a CPA and has a Masters Degree in tax law.[39]

Olivia testified at trial that when she told Norman that he would have to speak to Rebeck, which, according to her was on May 17, 2016, she believed that she was entitled to all of the Proceeds.[40]  She reasoned that if she was responsible for the tax on the capital gain from the sale, then all of the Proceeds were hers.[41]

After Olivia's refusal to give Norman any of the Proceeds, Norman contacted his attorney

---

[36]  *Id.* at 69 (testimony of Norman).

[37]  Final Pretrial Order (Docket # 53) at 7 ¶ 6 (Stipulation of Facts); PX 6 ("Unsworn Declaration of Olivia M. Wise Pursuant to May 3, 2017 Order") at 2, ¶ 5; Trial Tr. (Docket # 72) at 152 (testimony of Olivia).

[38]  Trial Tr. (Docket # 73) at 184 (testimony of Olivia); Trial Tr. (Docket # 72) at 154-55 (testimony of Olivia); Trial Tr. (Docket # 70) at 95 (testimony of Rebeck).

[39]  Trial Tr. (Docket # 70) at 125; DX B at 4.

[40]  Trial Tr. (Docket # 73) at 178-80 (testimony of Olivia); Trial Tr. (Docket # 72) at 154 (testimony of Olivia).

[41]  Trial Tr. (Docket # 73) at 179 (testimony of Olivia); Trial Tr. (Docket # 72) at 156 (testimony of Olivia).

Jim DeLine ("DeLine"), who then contacted Rebeck and made repeated demands, over roughly a 30-day period, for surrender of the Proceeds.[42]  Rebeck represented to DeLine that there were "unexplained 'tax issues'" and although she promised to provide Norman with "'calculations related to the [P]roceeds,'" she never did so.[43]

Rebeck scheduled a meeting with DeLine and others for May 24, 2016, but DeLine refused to attend any meeting with Rebeck unless and until Norman received $250,000 of the Proceeds.  Olivia refused to give Norman any portion of the Proceeds, so no meeting between the parties occurred.[44]

### 4.  Norman's state court lawsuit against Olivia

On July 27, 2016, after about a month of demands from DeLine to Rebeck to surrender $250,000 of the Proceeds, with Olivia still refusing to give Norman any of the Proceeds, Norman filed a civil lawsuit against Olivia in Oakland County, Michigan Circuit Court (the "State Court Lawsuit").[45]  The complaint in the State Court Lawsuit contained ten counts  and sought the following relief:

> A. An order of specific performance requiring [Olivia] to surrender the Proceeds to Plaintiff immediately.

> B.  An order preventing [Olivia] from spending, transferring, encumbering, and/or disposing of any of the Proceeds during the pendency of this case;

---

[42]  Trial Tr. (Docket # 73) at 69-72 (testimony of Norman).

[43]  PX 22 ("State Court Complaint") at ¶¶ 33-35; DX B (Tr. of March 15, 2017 hearing on Olivia's motion to set aside Default Judgment) at 7.

[44]  Trial Tr. (Docket # 73) at 184 (testimony of Olivia).

[45]  A copy of the civil complaint by Norman against Olivia is at PX 22.

C.  A money judgment against [Olivia] in the amount of $371,819.38;

D.  Pursuant to [Mich. Comp. Laws §] 600.2919a, an award of three times the actual damages suffered by [Norman] as a result of [Olivia's] conversion;

E.  A full, formal accounting of the Proceeds;

F.  Rescission or reformation of the Agreement to prevent a windfall to [Olivia] and return [Norman] to the status quo before the Agreement;

G.  An award of costs, attorney fees, and prejudgment interest; and

H.  Any other legal or equitable relief that the Court deems just and proper.[46]

Eventually, on February 1, 2017, the court in the State Court Lawsuit entered an order (the "Constructive Trust Order") granting a motion by Norman for discovery sanctions against Olivia, based on Olivia's violation of a January 24, 2017 order compelling discovery.  The Constructive Trust Order stated, in relevant part:

IT IS ORDERED:

A.  [Norman's] motion is granted for the reasons stated on the record and in the motion. [Olivia] shall provide full and complete discovery responses by Feb[.] 15, 2017.

B.  The sale proceeds in the amount of $371,819.38 received by [Olivia] from the sale of [the] South Wilson Avenue [Property] are hereby held in a constructive trust, and [Olivia] shall, within two days after entry of this order, pay all such [P]roceeds into the court pending the final disposition of this action; and

C.  [Norman] is awarded costs, including reasonable

---

[46] Compl. in State Court Lawsuit (PX 22) at 10.

attorney fees, in the amount of $1,000, against [Olivia] and [Olivia's] attorney of record, Chelsea M. Rebeck, jointly and severally, which shall be paid within 14 days after entry of this order.[47]

On February 15, 2017, the state court entered an order granting a motion by Norman for default judgment (the "Default Judgment"), after Olivia failed to respond or to appear at the hearing on the motion. The Default Judgment provided, in relevant part:

> IT IS ORDERED:
>
> A. [Norman's] motion is granted for the reasons stated in the motion and on the record. A judgment on [Norman's] complaint (including count 9 – fraud) is entered in favor of Norman H. Wise against Olivia M. Wise in the amount of $371,819.38. The judgment shall accrue interest at the statutory rate until paid in full;
>
> B. Olivia M. Wise and all persons in active concert or participation with her are restrained and enjoined from directly or indirectly selling, liquidating, assigning, transferring, converting, loaning, encumbering, pledging, dissipating, concealing, spending, withdrawing, or otherwise disposing of any money, funds, or proceeds received from the sale of the real property located at 137 South Wilson Avenue, Royal Oak, Michigan; and
>
> C. In addition to the costs previously awarded to [Norman, Norman] is awarded costs, including reasonable attorney fees, in the amount of $750 against [Olivia] and [Olivia's] attorney of record, Chelsea M. Rebeck, jointly and severally, for failing to appear at [Olivia's] deposition and failing to attend the hearing on this motion. All costs shall be paid within 7 days after entry of this order.
>
> This order resolves the last pending claim and closes the case.[48]

### 5. The other lawsuits against Olivia

---

[47] PX 28.

[48] PX 23.

17

In addition to the State Court Lawsuit, Olivia was a defendant in three other lawsuits filed after the closing of the South Wilson Avenue Property: (1) an eviction proceeding, by which Norman evicted her from the Fairfax Street Property; (2) a lawsuit by Olivia's former domestic partner for custody of her children (purportedly prosecuted with the aid and support of Norman) (the "Custody Lawsuit"); and (3) a lawsuit in which Norman sought grandparenting visitation rights ("Grandparenting Visitation Lawsuit").[49] Olivia retained attorneys, to act as co-counsel with Rebeck, to defend her in these lawsuits, and became responsible for attorney fees and costs as a result. As detailed later in this opinion, Olivia used a significant portion of the Proceeds for attorney retainers and for payment of attorney fees and expenses related to the lawsuits against her.

### 6. Olivia's transfers of the Proceeds in July and August of 2016

In July and August 2016, Olivia made three major transfers of the Proceeds. These three transfers resulted in a total of $330,000 of the Proceeds being withdrawn from Olivia's Vibe Credit Union Account.

### a. Olivia's purchase of the minivan with some of the Proceeds, and titling of it jointly with her mother

First, Olivia made transfers in order to buy a 2016 Chrysler Town and County minivan (the "Minivan"). On July 29, 2016, Olivia withdrew $15,000 of the Proceeds from her Vibe Credit Union Account and deposited the funds into another account with Vibe Credit Union, to serve as security for a loan Vibe Credit Union made to her to help her purchase the Minivan.

---

[49] Trial Tr. (Docket # 72) at 131, 169-70 (testimony of Olivia); *see also* Trial Tr. (Docket # 70) at 126 (testimony of Rebeck).

That same day, Olivia also obtained a cashier's check totaling $33,000 out of the Proceeds, to help fund her purchase of the Minivan.

Although Olivia bought the Minivan for herself, she had it titled jointly in both her name and her mother's name.[50] Her explanation for this joint titling of the Minivan, even though her mother had not contributed any funds to the purchase of the Minivan, varied at different times. Olivia variously testified (1) that she did it for estate planning purposes; (2) that she did it because she wasn't able to get car insurance herself; and (3) that "given how tenuous things had become with [her] father, [she] wanted to have her [mother] on the title as well."[51] When asked to explain this last reason, Olivia stated that "[i]f [she] were to die it would then easily transfer to her [mother]."[52]

### b. Olivia's transfer of $32,500 to her mother

In August 2016, Olivia transferred a total of $32,500 of the Proceeds to her mother. Olivia testified that this transfer was to pay for making improvements to her mother's home, so that the basement would be suitable for Olivia and her children to live in; for pre-paid rent; and for three-quarters of the household living expenses. Olivia's transfers were made in two payments — $7,500 to her mother on August 3, 2016, and $25,000 to her mother on August 26, 2016.[53] There was no initial or later allocation of the $32,500 among the three cost items which

---

[50] Trial Tr. (Docket # 73) at 187-88 (testimony of Olivia); *see also* PX 6 ("Unsworn Declaration of Olivia M. Wise Pursuant to May 3, 2017 Order") at 2-3, ¶¶ 11-12.

[51] Trial Tr. (Docket # 73) at 188, 194-96 (testimony of Olivia); PX 7 (Tr. of June 14, 2017 Meeting of Creditors) at 17 (testimony of Olivia); Trial Tr. (Docket # 72) at 160 (testimony of Olivia).

[52] *Id.* (testimony of Olivia).

[53] PX 6 ("Unsworn Declaration of Olivia M. Wise Pursuant to May 3, 2017 Order") at 3, ¶¶ 15, 17; *see also* Trial Tr. (Docket # 73) at 208-10 (testimony of Olivia); Trial Tr. (Docket # 72) at 126-28,

19

the money allegedly was intended to cover. Rather, "[i]t was just an arbitrary amount."[54] Olivia testified: "We did not have a specific amount that we agreed on. It was just an amount that she and I agreed on."[55] Olivia and her children lived in her mother's basement for about nine months (from September or October 2016 to May 2017).[56]

Olivia testified that she was not expecting to get any money back from the portion of the Proceeds she transferred to her mother. But in December 2016, Olivia's mother gave her $2,500 back in cash or checks, because Olivia had "exhausted the remaining amount of money."[57] And Olivia asked her mother for an accounting of how the $32,500 had been spent. Olivia asked for this "several times throughout all of 2016 as well as 2017," and possibly even after her bankruptcy case had been filed.[58] Olivia testified that she asked her mother for an accounting "probably more than three times."[59] Although her mother promised to provide an accounting, her she never did so.[60]

### c. Olivia's transfer of $250,000 of the Proceeds to Rebeck's law firm

On August 10, 2016, Olivia transferred $250,000 of the Proceeds to Rebeck's law firm, to

---

168 (testimony of Olivia).

[54] Trial Tr. (Docket # 72) at 166 (testimony of Olivia).

[55] *Id.*

[56] Trial Tr. (Docket # 73) at 209 (testimony of Olivia).

[57] *Id.* at 211-13; PX 6 ("Unsworn Declaration of Olivia M. Wise Pursuant to May 3, 2017 Order") at 4, ¶ 18; Trial Tr. (Docket # 72) at 169 (testimony of Olivia).

[58] Trial Tr. (Docket # 72) at 127-28 (testimony of Olivia); *see also* Trial Tr. (Docket # 73) at 213 (testimony of Olivia).

[59] Trial Tr. (Docket # 72) at 127 (testimony of Olivia)

[60] *Id.*

be held in the Rebeck law firm's client trust account under a revised Fee Agreement entered into on July 5, 2016 by Olivia and Rebeck (the "Revised Fee Agreement").[61] The Revised Fee Agreement was the second fee agreement Olivia had entered into with Rebeck. The first fee agreement was entered on May 23, 2016. Paragraph 2 of that first agreement stated in relevant part:

> 2. Compensation and Fees. Client understands that the attorney will be compensated on an hourly or unit charge basis. The hourly/"unit fee" is computed as follows:
>
> > a. Attorney Fees. The initial payment of $1,000.00 constitutes an agreed non-refundable advance fee, which shall be payable before any services are rendered by Attorney. The Client will be billed in accordance with the hourly rate/costs set forth below.
>
> > b. Hourly rate: Attorney $450.00  Legal Assistants $250.00[62]

Paragraph 2 of the Revised Fee Agreement provided, in relevant part:

> 2. Compensation and Fees. Client understands that the attorney will be compensated on an hourly or unit charge basis. The hourly/"unit fee" is computed as follows:
>
> > a. Attorney Fees. Client shall deposit an additional retainer amount of $250,000.00 to be deposited in Attorney's IOLTA account. **This amount shall be disbursed as directed by Client for the following uses: Periodic billing by Attorney for representation, payment of tax liability- currently unknown amount, and as directed by client, in writing.**
>
> > b. Hourly rate: Attorney $450.00  Legal Assistants $250.00[63]

---

[61] PX 6 ("Unsworn Declaration of Olivia M. Wise Pursuant to May 3, 2017 Order") at 3 ¶ 16; PX 5 ("Affidavit of Chelsea M. Rebeck") at ¶ 3. A copy of the Revised Fee Agreement is attached to the Rebeck's affidavit (PX 5) at pdf. p. 6.

[62] PX 5 at pdf. p. 2; *see also* Trial Tr. (Docket # 72) at 123 (testimony of Olivia).

[63] PX 5 at pdf. p. 6 (emphasis added); *see also* Trial Tr. (Docket # 72) at 123-24 (testimony of Olivia).

Rebeck testified that "[she] created [the Revised Fee Agreement] because Olivia had asked to put the [$250,000] in the IOLTA account and so [she] wanted something prepared to reflect that."[64] Rebeck testified further as follows:

> Q. This new agreement was created because Olivia requested that she wanted to put money into your IOLTA account?
>
> A. Yes, I created the agreement because I needed something to document the funds.
>
> Q. And you had concerns about engaging in that transaction without that documentation, correct?
>
> A. I didn't have concerns. I just -- it's something that I would typically do **if I was holding money for someone**.[65]

When asked why she had transferred a quarter of a million dollars to Rebeck's law firm on August 10, 2016, Olivia testified:

> That was when we finally were able to get all of the information together for me to transfer it to [Rebeck]. She had been traveling in the month of July, I had been traveling in the month of July. We finally got the transfer information to send her retainer that I had agreed to send her in July.
>
> . . .
>
> **The $250,000 was the amount of money that my father had hoped to receive right away**. **And I felt** given the eviction that **that money should be secured** so that it could be used for taxes as well as for the lawsuit and hopefully the remainder would go to my father after we addressed all the tax issues.[66]

---

[64] Trial Tr. (Docket # 70) at 200 (testimony of Rebeck).

[65] *Id.* (emphasis added).

[66] Trial Tr. (Docket # 73) at 214 (testimony of Olivia) (emphasis added).

22

Eventually, much of the $250,000 Olivia transferred to Rebeck's law firm was disbursed, at Olivia's direction, to pay Olivia's ongoing legal fees and expenses owed to Rebeck and other attorneys Olivia had hired.[67]  Olivia testified:  "Ms. Rebeck and I would be sitting with the attorney and I would instruct her to cut a check to the attorney that I was engaging in for whatever case that I was being sued at the moment."[68]  Rebeck also gave Olivia money in the form of cash or checks from the Proceeds she was holding, whenever Olivia requested such money for her discretionary spending.[69]  From December 2016 through April 2017, at Olivia's direction,  Rebeck disbursed to Olivia, or in one case, spent for a personal item for Olivia, the following amounts, totaling $26,104.00, out of the $250,000 of the Proceeds that Olivia had transferred to Rebeck:

| Date | Amount |
|------|--------|
| • 8/9/2016 | $ 1,100.00 (reimbursement for laptop Rebeck purchased for Olivia) |
| • 12/22/2016 | $   204.00 |
| • 1/11/2017 | $10,000.00 |
| • 1/13/2017 | $ 2,000.00 |
| • 1/12/2017 | $   300.00 |
| • 2/27/2017 | $ 1,500.00 |
| • 3/1/2017 | $ 3,000.00 |

---

[67]  Trial Tr. (Docket # 72) at 109 (testimony of Olivia).

[68]  *Id.*

[69]  Trial Tr. (Docket # 73) at 267 (testimony of Olivia); *see also* PX 6 ("Unsworn Declaration of Olivia M. Wise Pursuant to May 3, 2017 Order") at 4, ¶¶ 19-22.

- 3/3/2017          $ 2,000.00

- 3/30/2017        $ 3,000.00

- 4/11/2017        $ 3,000.00[70]

When Rebeck was asked why she gave Olivia back some of the $250,000 in Proceeds

that Olivia had transferred into the Rebeck law firm's trust account, Rebeck responded: "Because

[Olivia] requested that I do so."[71]

### 7. The March 15, 2017 hearing in the State Court Lawsuit, on Olivia's motion to set aside the Default Judgment

On March 15, 2017, the court in the State Court Lawsuit held a hearing on a motion by

Olivia to set aside the Default Judgment.[72]  Attorney Sara Allen ("Allen") represented Olivia at

the hearing.  Olivia and Rebeck also attended the hearing.  DeLine appeared at the hearing on

behalf of Norman.  Olivia's position at the hearing was that the South Wilson Avenue Property

was a gift to her from her father.[73]  DeLine argued that Olivia's own e-mail of February 19, 2016,

which Olivia had failed to mention in her affidavit in support of her argument that she had a

"meritorious defense" to the State Court Lawsuit, "dispell[ed] any notion that [the South Wilson

Avenue Property] was ever a gift."[74]  DeLine argued further that Olivia had not shown either

"good cause" to set aside the Default Judgment or any meritorious defense to Norman's claims in

---

[70] PX 36 ("Accounting for Chelsea M. Rebeck, JD, PC"); *see also* Trial Tr. (Docket # 73) at 252 (testimony of Olivia).

[71] Trial Tr. (Docket # 70) at 145 (testimony of Rebeck).

[72] A transcript of the March 15, 2017 hearing is at DX B.

[73] DX B at 3-4, 13.

[74] *Id.* at 7-8.

the State Court Lawsuit.[75]

During the hearing the state court asked Allen where the Proceeds were.[76] This exchange

followed:

> MS. ALLEN: Not with me.
>
> THE COURT: I understand, but I saw counsel back there shaking her head no when it was alleged that it was in her trust account.
>
> MS. REBECK: Your Honor, Olivia did transfer some money to my trust account to pay for her legal fees for this case, as well as the custody cases, and there's not very much left, and I don't know how long the custody cases are gonna drag on, but the [P]roceeds were not transferred to me. She . . . paid a retainer to me for all of the various cases and I've been paying the other attorneys out of my trust account at this point, so.
>
> MS. ALLEN: Your honor, I would note for the record that Mr. De[L]ine asked me on the telephone when I told him I was filing an appearance if I knew where the [P]roceeds were, I said I think some of the [P]roceeds are in Ms. Rebeck's trust account. To this day I have no knowledge of where or what really happened with the [P]roceeds. . . .
>
> MR. DELINE: Your Honor, in my conversation with Ms. Allen I asked her where is the [P]roceeds, she said "They are - - to my knowledge they are in Ms. Rebeck's trust account." That's exactly what she told me on the telephone. So, today is the first time that I'm hearing that the [P]roceeds aren't there. We still don't know where they are, your Honor.
>
> And really, your Honor, this case has been pending for months and months. There's - - four or five months of discovery have passed, [Norman] has nothing. No discovery responses, . . . no information as to where the money went, no documents, no information about what her defenses were to the answer to the

---

[75] *Id.* at 8-11 (no good cause), 11, 14-15 (no meritorious defense).

[76] *Id.* at 15. ("THE COURT: Where is the money?").

> complaint to support her affirmative defenses. Five months of time
> has elapsed and now the money has apparently disappeared. This
> is exactly why the court should not set aside the default, re-open
> the case for another five months of discovery, because that money
> is gonna be gone if its hasn't disappeared already.
>
> [Norman] has waited enough for his money. Absent a
> meritorious defense, absent good cause, the court has complete
> discretion to deny the motion to set aside the default judgment.[77]

At the conclusion of the hearing, the state court delivered a bench opinion denying

Olivia's motion. The state court found that Olivia had not established good cause to set aside the

Default Judgment and that there was nothing in Olivia's affidavit filed in support of her motion

"that would establish a meritorious defense."[78] A creditor's examination was scheduled for

March 16, 2017.

At that time, the Custody Lawsuit and the Grandparenting Visitation Lawsuit were still

pending against Olivia. And Olivia was concerned about how the information obtained in any

creditor's examination would impact those lawsuits.[79]

### 8. Olivia's decision to file bankruptcy

After the March 15, 2017 hearing, and after asking her attorneys whether the

$371,819.38 debt arising out of the Default Judgment was a dischargeable debt, Olivia decided to

file a bankruptcy case. According to Olivia, the primary reason for filing bankruptcy was to

avoid having to appear at the creditor's examination, which she feared would be detrimental to

---

[77] *Id.* at 15-17.

[78] *Id.* at 17-18.

[79] Trial Tr. (Docket # 73) at 284-85 (testimony of Olivia); Trial Tr. (Docket # 72) at 80-83 (testimony of Olivia).

her in the other pending lawsuits against her.[80]  Olivia testified that she also wanted to get a

discharge of the debt she owed to her father under the Default Judgment.[81]

### 9.  Olivia's first Chapter 7 case

On March 16, 2017, Olivia filed a voluntary petition for relief under Chapter 7, Case No.

17-43735.[82]  This was Olivia's first bankruptcy case.  Olivia was represented by attorney Bert

Whitehead, IV ("Whitehead") in filing the case.  The case was filed on an emergency basis, so

that Olivia would not have to appear at the creditor's examination scheduled for that same day.

No schedules or statement of financial affairs were filed in Olivia's first bankruptcy case.

This Court dismissed Olivia's first bankruptcy case on March 27, 2017, because Olivia

was ineligible to be a debtor under 11 U.S.C. § 109(h)(1).  That section generally requires that a

debtor obtain a credit counseling briefing within 180 days before or on the date of filing a

bankruptcy petition.  Olivia had obtained a credit counseling briefing only after the petition date,

on March 23, 2017.[83]

### 10.  Olivia's second bankruptcy case

On April 14, 2017, Olivia filed her second and currently pending Chapter 7 bankruptcy

case, again through attorney Whitehead.[84]  By the time Olivia filed her second case, both the

---

[80]  *Id.*

[81]  Trial Tr. (Docket # 72) at 81, 195 (testimony of Olivia); PX 7 (Tr. of June 14, 2017 Meeting of Creditors) at 20 (testimony of Olivia) (stating in response to the question as to why she was filing bankruptcy: "Because my father is suing me for $371,000.").

[82]  Docket # 1 in Case No. 17-43735.

[83]  "Order Dismissing Case" (Docket 16 in Case No. 17-43735).

[84]  Docket # 1 in Case No. 17-45621.  A copy of the petition in this case is at PX 1.

Custody Case and the Grandparenting Visitation Lawsuit had been resolved in her favor, so "the only reason left [for Olivia to file her second bankruptcy case was] to address the $371,000 [D]efault [J]udgment."[85] By the time Olivia filed her second case, there was just under $34,000 of the Proceeds remaining in Rebeck's trust account.

### 11. The many false statements in Olivia's bankruptcy schedules and statement of financial affairs

Whitehead had no direct contact with Olivia before filing her first or second bankruptcy cases. Olivia worked with Rebeck's administrative staff, who were not attorneys, using Rebeck's bankruptcy software, to prepare a first draft of the bankruptcy schedules and statement of financial affairs. Olivia provided the information to Rebeck's staff to include in the bankruptcy papers, and worked with them to input that information into the bankruptcy software for the first draft of the papers. Whitehead then reviewed the draft, asked questions by e-mail, and suggested revisions to the draft, also by e-mail.[86]

At the time Whitehead was reviewing the draft bankruptcy papers for Olivia's second bankruptcy case, he did not know any of the following things:

- that Olivia had entered into the Agreement with Norman regarding the transfer and sale of the South Wilson Avenue Property and the purchase of the Fairfax Street Property;

- that the South Wilson Avenue Property had been transferred to Olivia, within one year before Olivia filed her second bankruptcy case;

- that Olivia had then sold the South Wilson Avenue Property;

---

[85] Trial Tr. (Docket # 72) at 180-81 (testimony of Olivia); *see also* Docket # 19 in Case No. 17-45621 at 2, ¶ 1, *but see* Trial Tr. (Docket # 70) at 11 (testimony of Olivia).

[86] Trial Tr. (Docket # 73) at 114-18, 142 (testimony of Whitehead).

28

- that Olivia had received $371,789.38 in Proceeds from the sale of the South Wilson Avenue Property;

- that Olivia had the Proceeds deposited into her account at Vibe Credit Union;

- that Olivia purchased the Minivan with a portion of the Proceeds and included her mother as co-owner on the title;

- that Olivia had transferred $32,500 of the Proceeds to her mother;

- that Olivia had transferred $250,000 of the Proceeds to Rebeck to hold for her in Rebeck's law firm's IOLTA account;

- that Rebeck had later transferred some of the $250,000 back to Olivia;

- that Olivia had directed Rebeck to pay other attorneys tens of thousands of dollars out of the Proceeds held in Rebeck's law firm's IOLTA account;

- that Rebeck still had just under $34,000 remaining from the Proceeds in her law firm's IOLTA account; and

- that Olivia had an interest in the remaining funds from the Proceeds that Rebeck was holding for her in Rebeck's law firm's IOLTA account.[87]

Whitehead did not know any of these facts because neither Olivia, nor Rebeck, nor any of Rebeck's staff had informed Whitehead of these facts. For that reason, Whitehead prepared and filed schedules and a statement of financial affairs ("SOFA"), in Olivia's second bankruptcy case, in which none of these facts were disclosed.

Olivia filed the original schedules and SOFA with the petition in her second bankruptcy case, on April 14, 2017. Olivia reviewed her original schedules and SOFA before they were filed, and authorized her attorney to electronically sign her name to them, under penalty of perjury.[88] In so doing, Olivia declared, under penalty of perjury, that she had read the schedules

---

[87] *Id.* at 131-33 (testimony of Whitehead).

[88] Trial Tr. (Docket # 72) at 33-34, 39-40 (testimony of Olivia).

and the SOFA, that the schedules "are true and correct," and that the answers in the SOFA "are true and correct."[89]

Despite this, the schedules and SOFA were riddled with false statements. Among other things, they did not disclose any information regarding the transfer to Olivia, and sale by her, of the South Wilson Avenue Property; Olivia's transfers of most of the Proceeds, including the $250,000 transfer to the Rebeck law firm, the $32,500 in transfers to Olivia's mother, or the total of $48,000 in transfers to buy the Minivan; or Olivia's interest in the remaining Proceeds in Rebeck's law firm's IOLTA account.[90] The schedules and SOFA also did not disclose that Olivia had transferred a one-half interest in the Minivan to her mother.

Following are specific details of Olivia's many false statements. The numbering here is for ease of reference later in this Opinion.

1.     SOFA Question 18 asked:

> **Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?[91]**
> Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property).
> Do not include gifts and transfers that you have already listed on this statement.

In response to Question 18, Olivia stated "No."[92] This answer was false because it failed to disclose the many transfers detailed above. For example, this answer failed to disclose

---

[89]  PX 1 at pdf. pp. 41, 53.

[90]  *See* PX 1.

[91]  In quoting from the schedule or SOFA forms cited, the Court has bolded the language that is in bold on the forms.

[92]  *Id.* at pdf. p. 49.

that less than a year before filing bankruptcy, on May 10, 2016, Olivia sold and transferred the South Wilson Avenue Property. And such sale and transfer certainly was not in the ordinary course of Olivia's business or financial affairs.

2. In response to Question 4 of her original SOFA, Olivia listed Gross income of $9,000 from January 1 of the current year (2017) until the date she filed for bankruptcy (April 14, 2017).[93] This was false; Olivia, in fact, had $0.00 income during this time period, as is reflected in an amended SOFA she filed on June 20, 2017.[94]

3. In response to Question 5 of her original SOFA, which asked: "**Did you receive any other income during this year or the two previous calendar years?**," Olivia failed to disclose the $371,819.38 in Proceeds from the sale of the South Wilson Avenue Property.[95] This made Olivia's answer to Question 5 false. And in the amended SOFA Olivia filed on June 20, 2007, Olivia listed the Proceeds under this section, in an "[u]nknown" amount, and stated that it was "[u]ndetetermined whether this was income."[96]

4. In Schedule A/B, Question 3.1 of the original schedules, in response to the question "**Who has an interest in the property [listed in Question 3 (the Minivan)]?**," Olivia stated that *only* she had an interest in the Minivan, by checking the box in front of "Debtor 1 only."[97] This was false, because the Minivan was titled jointly in the names of both Olivia and her mother.

5. Olivia did not disclose in her original Schedule A/B that she had an interest in just under $34,000 in cash remaining from the Proceeds, which Rebeck was still holding for her in Rebeck's law firm's IOLTA account. This should have been disclosed in Olivia's responses to Questions 25, 30, 35, or 53, and because it was not, Olivia's answers to one or more of those Questions was false:

- Question 25 requires a debtor to disclose any "**equitable or future interests in property (other than anything listed in line 1) and rights or powers exercisable for your benefit.**" In response to Question 25, Olivia stated that she had no such interest, by checking the box "No" and stating "0.00" for the current value of the

---

[93] *Id.* at pdf. p. 43.

[94] Docket # 63 in Case No. 17-45621 at pdf. p. 21.

[95] PX 1 at pdf. p. 43.

[96] Docket # 63 in Case No. 17-45621 at pdf. p. 21.

[97] PX 1 at pdf. p. 11.

property.[98]

- Question 30 requires a debtor to disclose "**[o]ther amounts someone owes you.**" In response to Question 30, Olivia stated that she had no such amount, by checking the box "No" and stating "0.00" for the current value of the property.[99]

- Question 35 requires a debtor to disclose "**[a]ny financial assets [the debtor] did not already list.**" In response to Question 35, Olivia stated that she had no such financial assets, by checking the box next to "No" and stating "0.00" for the current value of the property.[100]  It was not until she filed an *amended* Schedule A/B on November 22, 2017, more than 5 months *after* Rebeck had already transferred those funds to the Chapter 7 Trustee, that Olivia finally disclosed the $33,768.71 balance remaining of the Proceeds in her schedules. In that amended Schedule A/B, Olivia checked the box "Yes" and described the assets she was finally disclosing as: "Funds held by Chelsea Rebeck, JD, P.C. as of the petition date. These funds were subsequently paid to the trustee."[101]

- Question 53 requires a debtor to disclose "**other property of any kind [the debtor] did not already list.**"  Olivia stated "0.00" for the current value of such property.[102]

6.      Olivia also did not disclose in her original SOFA her transfer of $250,000 of the Proceeds to Rebeck's law firm's IOLTA account, nor did she disclose her transfers to her mother totaling $32,500.  Olivia answered the relevant questions in her original SOFA as follows:

- Question 16 asked:

        **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition?**

        Include any attorneys, bankruptcy petition preparers, or credit counseling agencies for services required in your bankruptcy.

---

[98]  *Id.* at pdf. p. 16.

[99]  *Id.*

[100]  *Id.* at pdf. p. 17.

[101]  Docket # 102 in Case No. 17-45621 at pdf. p. 5.

[102]  PX 1 at pdf. p. 19.

In response to Question 16, Olivia stated "Yes," and stated that she had transferred "$700" to "Rebeck Law."[103]  Olivia did not, however, disclose the $250,000 she had transferred to "Rebeck Law."  She also failed to disclose payments to the other attorneys who she had consulted regarding bankruptcy, or to GreenPath, Inc.  In an amended SOFA filed on June 20, 2017, Olivia listed "Rebeck Law," "Sara E. Allen," and "Bert Whitehead IV" as persons to whom she had made transfers, but Olivia did not disclose the amounts that she had transferred to each of these persons.  Rather, she stated that the amounts she had paid to her attorneys were "Unknown."[104]  In her amended SOFA filed on November 22, 2017, in response to Question 16, Olivia still stated, with regard to each lawyer or law firm listed, that the amount paid was "Unknown."[105]  But the amounts Rebeck paid, at Olivia's direction, to the other attorneys that Olivia had hired was disclosed by Rebeck in an accounting she filed with the Court on May 24, 2017.[106]  It showed that $164,827.29 had been paid to "Rebeck Law;" $400.00 had been paid to "Jenna Bommarito," an attorney who had represented Olivia at an eviction proceeding; $8,000 had been paid to "Boyer, Mitzgard, Nacy;" $10,000 had been paid to "Eisenberg, Middleditch;" and $5,000.00 had been paid to "Sara Allen."[107]

- Question 17 asked:

    **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors or to make payments to your creditors?**  Do not include any payment or transfer that you listed on line 16.

In response to Question 17, Olivia stated "No."[108]  This was false, because it did not disclose Olivia's $250,000 transfer to the Rebeck Law firm.  That firm certainly helped Olivia "deal with [her] creditors," by helping Olivia defend the lawsuits filed by Norman.

---

[103]  *Id.* at pdf. p. 48.

[104]  Docket # 63 in Case No. 17-45621 at pdf. pp. 24-25.

[105]  Docket # 102 in Case No. 17-45621 at pdf. pp. 12-13.

[106]  *See* PX 5 at pdf. p. 10.

[107]  *Id.*

[108]  PX 1 at 49.

33

- Question 18 asked:

  **Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?**

  Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property).
  Do not include gifts and transfers that you have already listed on this statement.

In response to Question 18, Olivia stated "No."[109]  This was false, because it did not disclose Olivia's $250,000 transfer to the Rebeck law firm, Olivia's $32,500 in transfers to her mother, and other transfers.  Later, in an amended SOFA filed on June 20, 2017, Olivia finally disclosed the $32,500 she paid to her mother for "housing for herself and her children;" the joint interest she transferred to her mother in the Minivan; and a "2004 Yukon motor vehicle" she had transferred to her mother.[110]

7.   In response to Question 2 of the original SOFA, which asked, "**During the last 3 years, have you lived anywhere other than where you live now?**," Olivia checked the box "No."[111]  This was false.  Olivia, had in fact lived at the South Wilson Avenue Property, the Fairfax Property, and in her mother's basement.  In an amended SOFA she filed on June 20, 2017, she corrected her response by checking the box next to "Yes" and listing the addresses.[112]

8.   In response to Question 6 of her original SOFA, which, in relevant part, asked: "During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?," Olivia checked the box "No."[113]  This was false.  As the "Accounting for Chelsea M. Rebeck, JD, PC" later showed, however, in the 90 days before Olivia filed bankruptcy on April 14, 2017, Olivia had made the following payments to the following creditors, totaling $35,515.00:

  - 1/17/2017    $10,000 to Eisenberg, Middleditch
  - 2/1/2017    $18,765 to January 2016 Bill-Rebeck Law

---

[109]  *Id.*

[110]  Docket # 63 in Case No. 17-45621 at pdf. p. 26.

[111]  PX 1 at 42.

[112]  Docket # 63 in Case No. 17-45621 at pdf. p. 20.

[113]  PX 1 at pdf. p. 44.

- 2/17/2017     $5,000 to Allen
- 2/21/2017     $750.00 to DeLine
- 2/27/2017     $1,000 DeLine[114]

Olivia had also paid Vibe Credit Union $284.00 "monthly;" Health Alliance Plan $950.00 "each month;" and had paid "various" creditors for "Extra Space Storage" $400 per month, in the 90 days before she filed bankruptcy, as was reflected in the amended SOFA she filed on June 20, 2017.[115]

9.     In response to Question 7 of the original SOFA, which asked, "**Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who is an insider?**," Olivia checked the box that stated "No."[116]  This was false.  Later, in the amended SOFA Olivia filed on June 20, 2017, Olivia checked the "Yes" box and listed the two payments she made to her mother totaling $32,500.00, for "[f]uture housing and other."[117]

10.    In response to Question 22 of the original SOFA, which asked:  "**Have you stored property in a storage unit or place other than your home within 1 year before you filed for bankruptcy?,**"  Olivia checked the box "No."[118]  This was false.  In an amended SOFA Olivia filed on June 22, 2017 (which amendment occurred after a June 14, 2017 meeting of creditors in which discrepancies in her schedules and SOFA were discussed),[119] she checked "Yes" and stated that she had stored "[f]urniture, household goods, appliances,

---

[114] *See* PX 5 at pdf. p. 10.

[115] Docket # 63 in Case No. 17-45621 at pdf. p. 22.

[116] PX 1 at pdf. p. 45.  This question on the form contained the following instructions for answering the question:

> *Insiders* **include your relatives**; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.

*Id.* (bold added).

[117] Docket # 63 in Case No. 17-45621 at pdf. p. 23.

[118] PX1 at pdf. p. 51.

[119] *See* PX 7 (Tr. of June 14, 2017 Meeting of Creditors).

tools, clothing, children's toys and other household items" at "Extra Space Storage" at 1150 Coolidge Highway, Troy Michigan 48084.[120]

11.  In her original Schedule A/B, in response to Question 6, which required Olivia to list and value any "**[h]ousehold goods and furnishings**" she had, Olivia stated that she had $650.00 worth of such goods and furnishings.[121] This was false.  Later, in an amendment to Schedule A/B filed on June 20, 2017, Olivia stated that she had $3,000 worth of household goods and furnishings, which she described as follows:

> Ordinary household goods, tools, including power tools, lawn mower, snow blower, wheelbarrow and furnishings at residence. Includes washer & dryer ($250 together), refrigerator ($300), freezer ($75). All more than five years old. No item worth more than $600.00. Estimated values stated for those items with an estimated value of more than $100.[122]

12.  In her original Schedule A/B, in response to Question 7, which required Olivia to list and value any electronics she had, Olivia stated that she had $500.00 worth of electronics.  The electronics that Olivia listed and valued were: "iMAC, PRINTER, TV, CELL PHONE, SPEAKERS AND DVD PLAYER."[123] This list was false.  Missing from the list was the laptop computer that Rebeck had purchased on Olivia's behalf for Olivia, and for which, on August 9, 2016, Olivia had reimbursed Rebeck $1,100.00, out of the Proceeds Rebeck was holding for Olivia.[124] In an amended Schedule A/B filed on June 22, 2017, Olivia added the "HP laptop [computer]" and a camera to her list of electronics, and doubled the value of her electronics to $1,000.[125]

13.  In her original Schedule A/B, in response to Question 9, which required Olivia to list and value any "[e]quipment for sports and hobbies," Olivia stated that she had "GOLF CLUBS" and a "BASEBALL GLOVE" worth "$50.00."[126] This answer was false.  In an amended Schedule A/B filed on June 22, 2017, the amount for such items had grown to $250.00 and

---

[120]  Docket # 64 in Case No. 17-45621 at pdf. p. 21-22.

[121]  PX 1 at pdf. p. 13.

[122]  Docket # 63 in Case No. 17-45621 at pdf. p. 7.

[123]  PX 1 at pdf. p. 13.

[124]  *See* PX 5 ("Accounting for Chelsea M. Rebeck, JD, PC") at pdf. p. 10.

[125]  Docket # 64 in Case No. 17-45621 at pdf. p. 2.

[126]  PX 1 at pdf. p. 13.

36

included a bicycle and camping equipment that previously had not been listed.[127]

14. In her original Schedule A/B, in response to Question 12, Olivia stated that she had no jewelry.[128] In an amended Schedule A/B Olivia filed on June 20, 2017, she again stated that she had no jewelry.[129] These statements were false. Later, in an amended Schedule A/B Olivia filed on June 22, 2017, Olivia stated that she had $2,000.00 in "[j]ewelry, location unknown."[130] She stated that the jewelry included "two sets of diamond earrings, pearl earrings and necklace, pearl "M," and gold bracelet."[131] Olivia also noted: "Lost or stolen. Not seen since October, 2013."[132] Olivia also stated that she had 2 watches worth $50.00 and costume jewelry worth $10.00.[133]

15. In her original Schedule A/B, in response to Question 14, Olivia stated that she had no **"other personal and household items [she had] not already list[ed]."**[134] This was false; later, in her amended Schedule A/B, Question 14, Olivia listed an "antique gold-colored lighter" and an "antique stopwatch."[135]

16. In her original Schedule A/B, in response to Question 16, Olivia stated that she had only $300.00 in cash on hand when she filed her petition.[136] This was false. In Olivia's amended Schedule A/B, filed on June 20, 2017, Olivia stated that she had $2,000.00 in cash on hand when she filed her petition.[137]

17. In her original Schedule A/B, in response to Question 17, where she was required to list all **"[d]eposits of money,"** Olivia stated that she had $700.00 in deposits of money at Vibe

---

[127] Docket # 64 in Case No. 17-45621 at pdf. p. 2.

[128] PX 1 at pdf. p. 13.

[129] Docket # 63 in Case No. 17-45621 at pdf. p. 2.

[130] Docket # 64 in Case No. 17-45621 at pdf. p. 2.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] PX 1 at pdf. p. 13.

[135] Docket # 64 in Case No. 17-45621 at pdf. p. 3.

[136] PX 1 at pdf. p. 14.

[137] Docket # 63 in Case No. 17-45621 at pdf. p. 8.

Credit Union.[138]  This answer was false.  In her amended Schedule A/B filed June 20, 2017, Olivia stated that she had $1,225.15 on deposit at Vibe Credit Union, plus an estimated balance of $250.00 on a Costco cash card, plus $500 on a prepaid Visa card.  She also stated that she had a Health Savings Account with an unknown amount in it.[139]

18.  In her original Schedule A/B, in response to Question 22, where she was required to list all **"[s]ecurity deposits and prepayments,"** Olivia checked the box "No."[140]  This was false.  In her amended Schedule A/B, filed June 20, 2017, in response to this same question, Olivia checked the box "Yes" and stated that she had $15,005.70 on deposit in a Vibe Credit Union Account, to secure an automobile loan.[141]

19.  In her original Schedule A/B, Question 30, where she was required to list all **"[o]ther amounts someone owes you,"** Olivia checked the box "No."[142]  This was false.  In her amended Schedule A/B, filed on November 22, 2017, in response to Question 30, Olivia checked the box "Yes, and explained: "Possible refunds from attorneys who were paid retainers.  Refund from Bowyer and Midgard received in the amount of $2,400. Other potential refunds are unknown.""[143]

20.  In her original Schedule A/B, in response to Question 33, which required Olivia to list **"[c]laims against third parties, whether or not [she had] filed a lawsuit or made a demand for payment**," she checked the box "No."[144]  This was false.  Later, in her amended Schedule A/B, filed on June 22, 2017, Olivia checked "Yes" and stated: "Claims against Norman Wise for breach of contract, emotional distress and other damages."[145]  And in her amended Schedule A/B, filed on November 22, 2017, in response to Question 30, Olivia checked the box "Yes, and added:

> Claim against Gary Davison, CPA, for fraud or intentional
> misrepresentation with respect to availab[i]lity to Debtor of tax

---

[138]  PX 1 at pdf. p. 14.

[139]  Docket # 63 in Case No. 17-45621 at pdf. p. 8.

[140]  PX 1 at pdf. p. 15.

[141]  Docket # 63 in Case No. 17-45621 at pdf. p. 9.

[142]  PX 1 at pdf. p. 16.

[143]  Docket # 102 in Case No. 17-45621 at pdf. p. 5.

[144]  PX 1 at pdf. p. 17.

[145]  Docket # 64 in Case No. 17-45621 at pdf. p. 5.

38

exemption pursuant to 26 USC 121 in connection with scheme by Norman Wise to avoid or evade income tax upon his sale of property on Wilson Avenue, Royal Oak, Michigan in May, 2016.[146]

### 12. Events occurring after Olivia filed her second bankruptcy case

On April 17, 2017, three days after Olivia filed her second bankruptcy case, Rebeck signed and mailed or personally delivered a Garnishee Disclosure to the state court in the State Court Lawsuit.[147]  In the Garnishee Disclosure, Rebeck marked an "X" in the box next to the following statement: "The garnishee [Rebeck] is not indebted to the defendant [Olivia] for any amount and does not possess or control the defendant's property, money, etc."[148]  On a blank line next to this statement the Garnishee Disclosure required Rebeck to provide a reason for marking the box.  Rebeck hand-wrote as her "Reason": "No Funds held for Debtor."[149]  This statement was false when made, of course, because at the time Rebeck still held just under $34,000 of the Proceeds in her client trust account.

On April 20, 2017, Norman filed a motion in Olivia's second bankruptcy case, seeking an order to compel Olivia to appear at a Rule 2004 examination; to produce certain documents; and to immediately turn over the Proceeds (the "April 20, 2017 Motion to Compel").[150]  When he received this motion, Whitehead first learned about the transfer and sale of South Wilson Avenue Property; the retention by Olivia of the Proceeds from the sale; and various transfers Olivia had

---

[146]  Docket # 102 in Case No. 17-45621 at pdf. p. 5.

[147]  PX 32.

[148]  *Id.* at ¶ 2.a.

[149]  *Id.*

[150]  PX 2 (Docket # 12 in Case No. 17-45621).

made of the Proceeds.[151] After receiving Norman's motion and reviewing it, Whitehead advised Olivia in a brief phone call and by e-mail that if any of the allegations in the motion were true, Olivia "may need to amend ["five or six questions of"] the schedules that [she had] answered no to."[152]

After Whitehead advised Olivia of the possible need to file amended schedules, on April 26, 2017, Olivia hired a different attorney to represent her in her bankruptcy case.[153] Olivia's new attorney filed a response to Norman's April 20, 2017 Motion to Compel, in which Olivia stated the following: "[T]he Debtor states that she believes that Chelsea Rebeck holds the [Proceeds]. The Debtor agrees that Ms. Rebeck should turn over the [Proceeds] to the [T]rustee because the Debtor's interest in the [Proceeds] is an asset of the estate."[154]

This Court held a hearing on Norman's motion on May 3, 2018, and granted the motion in large part, in a detailed order entered the same day.[155] Also on May 3, 2017, Rebeck delivered to the Chapter 7 Trustee the remaining $33,768.71 of the Proceeds that she was still holding in her IOLTA account for Olivia.[156]

## B. Applicable law

---

[151] Trial Tr. (Docket # 73) at 120-22 (testimony of Whitehead).

[152] *Id.* at 120, 122-23, 142.

[153] *See* Docket # 19 in Case No. 17-45621.

[154] *Id*. at 4 ¶ 5; *see also id.* at 7 ¶ 21, 8 ¶ 29.

[155] Docket # 40 in Case No. 17-45621.

[156] PX 5 ("Affidavit of Chelsea M. Rebeck") at ¶ 5 ("On May 3, 2017, Chelsea M. Rebeck, JD, P.C. delivered to counsel for the Chapter 7 Trustee the undisbursed balance of $33,768.71."); *see also* Trial Tr. (Docket # 70) at 139 (testimony of Rebeck).

40

Section 727(a) of the Bankruptcy Code contains twelve enumerated grounds for denying the debtor a discharge. *See* 11 U.S.C. §§ 727(a)(1)-727(a)(12). For the Court to deny the debtor a discharge under any one of these grounds, the party objecting to the discharge must prove all of the elements of such ground by a preponderance of the evidence. *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 683 (6th Cir. 2000). "'Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh start policy.' However, 'the very purpose of certain sections of the law, like [§ 727(a) ], is to make certain that those who seek the shelter of the [B]ankruptcy [C]ode do not play fast and loose with their assets or with the reality of their affairs.'" *Robin Singh Educ. Servs., Inc. v. McCarthy* (*In re McCarthy*), 488 B.R. 814, 825 (B.A.P. 1st Cir. 2013) (citing *Palmacci v. Umpierrez (In re Umpierrez*), 121 F.3d 781, 786 (1st Cir.1997) (internal quotation marks and citations omitted)).

### 1. Bankruptcy Code § 727(a)(2)(A)

Section 727(a)(2)(A) of the Bankruptcy Code states:

(a) The court shall grant the debtor a discharge, unless–
. . . .

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–
>
> > (A) property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A). "This section encompasses two elements: 1) a disposition of property, such as concealment, [transfer, removal, destruction, or mutilation,] and 2) 'a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the property.'"

41

*Keeney*, 227 F.3d at 683 (quoting *Hughes v. Lawson* (*In re Lawson*), 122 F.3d 1237, 1240 (9th

Cir. 1997)). "That statute specifies that both elements . . . must occur within a year before the

bankruptcy petition is filed. 11 U.S.C. § 727(a)(2)(A) (1998)." *Id.* at 684.

> [P]roof of harm is not a required element of a cause of action under Section 727. .
> . . [A] fair reading of the statute makes it clear that so long as there is an *intent* to
> hinder, delay, or defraud, in combination with an act such as a transfer, then a
> debtor should be denied the privilege of discharge. The statute does not provide
> that the creditors must have, in fact, been hindered, delayed or defrauded.

*Smiley v. First Nat'l Bank of Belleville* (*In re Smiley*), 864 F.2d 562, 569 (7th Cir. 1989)

(citations omitted) (italics in original).

### a. "Concealment"

Under § 727(a)(2)(A), the Plaintiff must also establish that the Debtor disposed of

property of the Debtor within one year of the bankruptcy by transferring, removing, destroying,

mutilating, or concealing it, or that the Debtor has permitted property of the Debtor "to be

transferred, removed, destroyed, mutilated, or concealed." *See* 11 U.S.C. § 727(a)(2)(A).

> Concealment includes overt acts of disguise and "other conduct,
> such as placing assets beyond the reach of the creditors or
> withholding knowledge of the assets by failure to divulge owed
> information." 6 Collier on Bankruptcy ¶ 727.02[6][b] (Alan N.
> Resnick & Henry J. Sommer eds., 16th ed. 2017) (citing *Village of
> San Jose v. McWilliams*, 284 F.3d 785 (7th Cir. 2002) (placing title
> to property in others' names and retaining beneficial interest)); *see
> also Keeney*, 227 F.3d at 682–83.

*Carter-Jones Lumber Co. v. Beatty* (*In re Beatty*), 583 B.R. 128, 136–37 (Bankr. N.D. Ohio

2018); *see also Cooper v. Crocker* (*In re Cooper*), No. 3:17-cv-00569, 2018 WL 1907448, at *2

(M.D. Tenn. Apr. 23, 2018) (quoting *Buckeye Retirement Co., LLC, LTD. v. Swegan* (*In re

Swegan*), 383 B.R. 646, 655 (B.A.P. 6th Cir. 2008)) ("'Concealment' is defined as, 'the

withholding of knowledge of an asset by the failure or refusal to divulge information required by law to be made known.'").  "Concealment may also occur when a debtor transfers 'legal title to property to a third party with the retention of a secret interest.'" *McDermott v. Recupero* (*In re Recupero*), No. 13-60322, 2014 WL 1884331, at *7 (Bankr. N.D. Ohio May 12, 2014) (citing *Ohio Citizens Trust Co. v. Smith* (*In re Smith*), 11 B.R. 20, 22 (Bankr. N. D. Ohio 1981) and *Kaler v. Craig* (*In re Craig*), 195 B.R. 443, 449 (Bankr. D.N.D. 1996)).

### b.  "Transfer"

Section 101(54) of the Bankruptcy Code defines "transfer."  It provides, in relevant part: "The term 'transfer' means . . . each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with– (i) property; or (ii) an interest in property."  11 U.S.C. § 101(54)(D).  "'Under the broad definition of transfer in 11 U.S.C. § 101(54), even disposition of possession, custody or control could qualify as a transfer.'" *Beatty*, 583 B.R. at 136 (quoting *RES–GA Diamond Meadows, LLC. v. Robertson* (*In re Robertson* ), 576 B.R. 684, 700 (Bankr. N.D. Ga. 2017)).

### c.  The intent element: intent to "hinder" or "delay" is sufficient; intent to "defraud" is also sufficient, but not required.

"[A]ctual, rather than constructive, intent is required on the part of the debtor."  *Retz v. Samson* (*In re Retz*), 606 F.3d 1189, 1196 (9th Cir. 2010) (internal quotation marks and citation omitted).  "[B]ecause of the inherent difficulties in proving intent, circumstantial evidence, including evidence of the debtor's conduct, may be used to establish his intent."  *Ayers v. Babb* (*In re Babb*), 358 B.R. 343, 350 (Bankr. E.D. Tenn. 2006) (citing *Buckeye Retirement Co., L.L.C. v. Heil* (*In re Heil*), 289 B.R. 897, 907 (Bankr. E.D. Tenn. 2003)).

43

Because the phrase "intent to hinder, delay, or defraud" in § 727(a)(2)(A) is in the disjunctive,

> [a] party objecting to the debtor's discharge under § 727(a)(2)[(A)] need not prove that a debtor intended to hinder, delay, *and* defraud his creditors; proof of any one is sufficient. Thus, for example, if plaintiffs are able to establish a debtor's intent to delay, it is not necessary to prove an intent to defraud.

*McDermott v. Kerr* (*In re Kerr*), No. 15-30531, 2017 WL 3880875, at *14 (Bankr. N.D. Ohio Aug. 30, 2017) (citing *Cuervo v. Snell* (*In re Snell*), 240 B.R. 728, 730 (Bankr. S.D. Ohio 1999) and *Los Alamos Nat'l Bank v. Wreyford* (*In re Wreyford*), 505 B.R. 47, 55 n.6 (Bankr. D.N.M. 2014)). This Court agrees with the many cases that have held that an intent *to defraud* is not necessary under § 727(a)(2)(A); rather, mere intent to hinder or delay is sufficient. *See Barclays/Am. Business Credit, Inc. v. Adams* (*In re Adams*), 31 F.3d 389, 394 (6th Cir. 1994) (affirming the bankruptcy court's denial of the debtors' discharge under § 727(a)(2)(A) based on "[t]he bankruptcy court's finding of intentional delay or hindrance under [§ 727(a)(2)(A)]" by the debtors); *Retz v. Samson* (*In re Retz*), 606 F.3d 1189, 1196 (9th Cir. 2010) (citation omitted) ("A debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2)[(A)]. Because the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor."); *First Nat'l Bank of Belleville v. Smiley* (*In re Smiley*), 864 F.2d 562, 568 (7th Cir. 1989) (citation omitted) ("[The debtor's] discharge must be denied pursuant to Section 727 because it is clear that he intended to hinder or delay his creditors, even if he had no intent to defraud them."); *Bernard v. Sheaffer* (*In re Bernard*), 96 F.3d 1279 (9th Cir. 1996) (citations omitted) ("Denial of discharge . . . need not rest on a finding of intent to *defraud*. Intent to hinder or delay is sufficient."); *Church Joint Venture v. Blasingame* (*In re Blasingame*), No.

44

08-28289-L, 2015 WL 13106325, at *15 (Bankr. W.D. Tenn. Jan. 19, 2015), *aff'd*, 559 B.R. 692

(B.A.P. 6th Cir. 2016) (citation omitted) ("A creditor need not prove that a debtor intended to

hinder, delay, *and* defraud his creditors; proof of any one is sufficient."); *Wiggains v. Reed* (*In Re*

*Wiggains*), No. 13-33757-SGJ-7, 2015 WL 1954438, at *15 & n.144 (Bankr. N.D. Tex. Apr. 28,

2015), *aff'd*, 848 F.3d 655 (5th Cir. 2017) (citing cases that have held that there are three separate

grounds for denial of discharge based on the intent element under § 727(a)(2)(A)) ("In addition

to those courts construing th[e] phrase ['intent to hinder, delay, or defraud'] to provide three

alternative bases in the context of section 548(a)(1)(A), an abundance of courts have also

interpreted the same phrase appearing in section 727(a)(2)(A) to offer three separate

grounds.").[157]

---

[157] The *Wiggains* court cited the following cases which held that § 727(a)(2)(A) does not require proof of fraudulent intent but rather, held that the intent element of § 727(a)(2)(A) can be established by proving an intent to hinder, or an intent to delay, or an intent to defraud:

> [*Bernard v. Sheaffer* (]*In re Bernard*[)], 96 F.3d 1279, 1281 (9th Cir.1996) (denial of discharge under § 727(a)(2)(A) "need not rest on a finding of intent to defraud. Intent to hinder or delay is sufficient."); [*Brooke Credit Corp. v. Lobell* (]*In re Lobell*[)], 390 B.R. 206, 219 (Bankr. M.D. La. 2008) (holding that an intent to defraud is not necessary to prove to prevent a debtor's discharge; intent to hinder or delay creditors suffices); [*Pher Partners v. Womble* (]*In re Womble*[)], 289 B.R. 836, 853 (Bankr. N.D. Tex. 2003) (declaring that extrinsic evidence of intent must exist to prevent debtor's discharge, whether that evidence be of intent to hinder, or intent to delay or intent to defraud); [*Adamson v. Bernier* (]*In re Bernier*[)], 282 B.R. 773, 780 (Bankr. D. Del. 2002) (stating that creditor must show either fraudulent intent or intent to hinder or delay); [*Cuervo v. Snell* (]*In re Snell*[)], 240 B.R. 728, 730 (Bankr.S.D.Ohio 1999) (noting that fraud need not be proved under § 727(a)(2) so long as debtor's intent to hinder or delay was established); [*Bank of Okla., N.A. v. Boudrot* (]*In re Boudrot*[)], 287 B.R. 582, 586 (Bankr.W.D. Ok[la]. 2002) ( "Because § 727(a)(2) is in the disjunctive, it is unnecessary . . . to prove fraud so long as they can establish the debtor's intent to hinder or delay.").

*Wiggains*, 2015 WL 1954438, at *15 n.144.

As the court in *Wiggains* noted, "interpreting the phrase 'intent to hinder, delay, or defraud' as three alternatives is not without dispute." *See Wiggains*, 2015 WL 1954438, at *16. As the court explained:

> A number of courts have interpreted the phrase "intent to hinder, delay, or defraud" in the Bankruptcy Code to require fraudulent intent, despite acknowledging the disjunctive phraseology. The majority of courts holding that the phrase "intent to hinder, delay, or defraud" constitutes a single test have cited back to the Elizabethan origins of the phrase and the historical common understanding in fraudulent conveyance law that actual fraud be involved.

*Id.* (footnotes omitted) (citing *Los Alamos Nat'l Bank v. Wreyford* (*In re Wreyford*), 505 B.R. 47, 56 (Bankr. D.N.M. 2014)).

In *Wreyford*, the court made an interesting and detailed case for interpreting § 727(a)(2)(A) to require intent to defraud:

> The phrase "hinder, delay, or defraud a creditor" is not defined in the Bankruptcy Code. Because the language is phrased in the disjunctive, some courts find that it is sufficient to deny a discharge under 11 U.S.C. § 727(a)(2)(A) if the debtor intends to hinder or delay a creditor, which may fall slightly short of fraudulent intent. *See, e.g., Retz*, 606 F.3d at 1200 (stating that "[a] debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2)(A)[,]" and that, "[b]ecause the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor.") (citation omitted). Ordinarily, the Court would agree that "or" denotes the disjunctive, so that proof of intent to hinder or delay without proof of intent to defraud would be sufficient. However, the phrase, "hinder, delay, or defraud creditors" used in 11 U.S.C. § 727(a)(2)(A) has a specialized meaning in the law. It has its origin in the Statute of 13 Elizabeth 3 Eliz., ch. 5 (1570). *Coder v. Arts*, 213 U.S. 223, 242, 29 S.Ct. 436, 444, 53 L.Ed. 772 (1909). "The statute of Elizabeth (chapter 5) against fraudulent conveyances has been universally adopted in American law as the basis of our jurisprudence on that subject . . . ." *Peters v. Bain*, 133 U.S. 670, 685, 10 S.Ct. 354, 359, 33

46

L.Ed. 696 (1890). Notwithstanding use of the disjunctive "or" in the phrase "hinder, delay, or defraud creditors," this form of expression, as used in fraudulent conveyance law, has always been held to require actual fraud to invalidate a conveyance. *See Coder v. Arts*, 213 U.S. at 242, 29 S.Ct. 436 ("This form of expression [intent to hinder, delay, or defraud creditors] is familiar to the law of fraudulent conveyances, and was used at the common law, and in the statute of Elizabeth, and has always been held to require, in order to invalidate a conveyance, that there shall be actual fraud . . . .").

Like 11 U.S.C. § 727(a)(2)(A), the fraudulent transfer provision found in 11 U.S.C. § 548(a)(1)(A) uses nearly the same phrase. *Compare* 11 U.S.C. § 727(a)(2)(A) (("the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property . . .") *with* 11 U.S.C. § 548(a)(1)(A)( "the debtor . . . made such transfer . . . with actual intent to hinder, delay, or defraud any entity . . ."). Consistent with fraudulent conveyance law generally, 11 U.S.C. § 548(a)(1)(A) requires proof of actual intent to defraud. Ordinarily, identical words used in different parts of the same statute are construed to have the same meaning. *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990) ("the normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning.") (citations and internal quotation marks omitted))[.] The Court sees no reason to interpret the nearly identical phrase differently for purposes of § 727(a)(2)(A), especially given § 727's extreme penalty. The Court must construe the denial of discharge provisions "liberally in favor of the debtor, and strictly against the creditor." [*Gullickson v. Brown* (*In re* *Brown*[)], 108 F.3d [1290,] 1292 [(10th Cir.1997)] (citation omitted). *See also*, [*Rosen v.*] *Bezner*, 996 F.2d [1527,] 1534 (observing that "§ 727 is to be construed liberally in favor of the debtor and that a total bar to discharge is an extreme penalty."). Construing "hinder, delay, or defraud" found in 11 U.S.C. § 727(a)(2)(A) to require actual fraudulent intent when the objection to discharge is based on a debtor's intent to hinder or delay a creditor is consistent with that directive. It should not be easier to deny a debtor's discharge than it is to recover a fraudulent transfer. And requiring proof of fraudulent intent in order to deny a debtor's discharge is consistent with centuries of fraudulent conveyance law from which the phrase "intent to hinder, delay or

47

defraud a creditor" is derived. It also comports with Tenth Circuit law in which the Circuit addressed the requirements of 11 U.S.C. § 727(a)(2)(A) but did not consider the disjunctive construction of the statute. *See Marine Midland Bus. Loans, Inc. v. Carey* (*In re Carey*), 938 F.2d 1073, 1077 (10th Cir.1991) ("To deny a discharge under § 727(a)(2), a court must find actual intent to defraud creditors.") (citations omitted)).

*Wreyford*, 505 B.R. at 55–58 (footnotes omitted).

The *Wiggains* court found "this historical reasoning unconvincing in light of the 'plain meaning' of the words, which the Supreme Court has cautioned 'should be conclusive, except in cases where the literal interpretation produces a result demonstrably at odds with the intention of the drafters.'" *Wiggains*, 2015 WL 1954438, at *16 (footnote omitted) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1980)).

This Court likewise disagrees with the approach taken in *Wreyford*, based on the Supreme Court's instruction in *Ron Pair* to construe a statute according to its plain meaning. The Supreme Court recently reiterated this instruction in *Lamar, Archer & Cofrin, LLP v. Appling,* __ U.S. __, 138 S. Ct. 1752 (2018). In *Lamar*, the court interpreted the phrase "statement respecting the debtor's . . . financial condition" in 11 U.S.C. § 523(a)(2)(B), and stated: "Our interpretation of the Bankruptcy Code starts 'where all such inquiries must begin: with the language of the statute itself.'" *Id.* at 1759 (quoting *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011)). The *Lamar* court then applied the "plain meaning" rule: "Because the Bankruptcy Code does not define the words 'statement,' 'financial condition,' or 'respecting,' we look to their ordinary meanings." *Id.* (citing *Ransom*, 562 U.S. at 69). The Court then applied the ordinary meaning of those words, relying on dictionaries, including Webster's Third New International Dictionary, to interpret the statute. *Id.*

48

In construing § 727(a)(2)(A), the Court therefore must look to the plain meaning of words not defined by the Bankruptcy Code. In its plain meaning, the word "or" is most commonly "used as a function word to indicate . . . an alternative between different or unlike things, states, or actions." *See* Webster's Third New International Dictionary 1585 (2002). This clearly implies that in the § 727(a)(2) phrase "with intent to hinder, delay or defraud," the words "hinder" and "delay" mean something different from the word "defraud." And this implies that this statutory phrase lists three *different* types of intent — *i.e.*, intent to hinder; intent to delay; and intent to defraud.

Moreover, while the word "or" is not comprehensively defined in the Bankruptcy Code, the word's meaning is supplied in part by Code § 102(5). That section, which is titled "[r]ules of construction," states that "[i]n this title— . . . 'or' is not exclusive[.]" 11 U.S.C. § 102(5). The legislative history of this provision gives an example of what this means: "if a party 'may do (a) or (b)', then the party may do either or both." S. Rep. No. 95–989, at 28 (1978).

This Bankruptcy Code provision implies that the phrase in § 727(a)(2) "with intent to hinder, delay or defraud" means any, some, or all of the three types of intent — *i.e.*, it means *any* of the following: intent to hinder; intent to delay; intent to defraud; or two of such types of intent; or all three of such types of intent. This in turn, implies that while intent to "defraud" is sufficient to meet the intent element in § 727(a)(2), it is not necessary. Intent to "hinder" and intent to "delay" each are sufficient intent under this provision.

Interpreting § 727(a)(2)(A) to require in all cases an intent to "defraud" would in effect read out of the statute the words "hinder" and "delay," rendering those words superfluous. This the Court cannot do. In *Lamar*, for example, the Supreme Court rejected the statutory

interpretation argued by the debtor in that case, holding that it "must be rejected, for it reads [the word] 'respecting' out of the statute." *Lamar*, 138 S. Ct. at 1761. The Supreme Court held that "'[A] statute ought . . . to be so construed that . . . no clause, sentence, or word shall be superfluous, void, or insignificant' (internal quotation marks omitted))." (quoting *TRW Inc. v. Andrews*, 534 U.S. 13, 31 (2001).) *Id*.

From all of this, the Court concludes that § 727(a)(2)(A) provides three different types of intent, any one of which will satisfy the intent element of this section.

This conclusion is supported by the vast majority of the cases, many of which are cited above. And it strikes the appropriate balance between the dual goals of the Bankruptcy Code — providing the honest, but unfortunate debtor with a fresh start but also "mak[ing] certain that those who seek the shelter of the [B]ankruptcy [C]ode do not play fast and loose with their assets or with the reality of their affairs." *McCarthy*, 488 B.R. at 825 (citing *Palmacci v. Umpierrez (In re Umpierrez)*, 121 F.3d 781, 786 (1st Cir.1997) (internal quotation marks and citations omitted)).

### d. The meaning of "intent to hinder" and "intent to delay"

With respect to two of the types of intent — intent to "hinder" and intent to "delay":

> The Bankruptcy Code [also] does not define an intent to "hinder" or an intent to "delay." According to the Oxford English Dictionary, the term "hinder" means to "keep back, delay; impede; obstruct; prevent." It defines "delay" as "put off to a later time; postpone, defer." In keeping with this plain meaning, courts have held that a debtor acts with an intent to "hinder" if he or she acts with ". . . an intent to impede or obstruct" creditors and an intent to "delay" if he or she acts with ". . . an intent to slow or postpone creditors." Others have stated more generally . . . that to act with "intent to hinder or delay" is to "act improperly to make it more difficult for a creditor to collect a debt."

50

*Wiggains*, 2015 WL 1954438, at *17  (footnotes omitted).

### e. "Intent to defraud"

As noted earlier in this opinion, "intent to defraud" may be shown by circumstantial evidence.  *See Hobbs v. Rao* (*In re Rao*), 526 B.R. 623, 627 (Bankr. E.D. La. 2015).  Such evidence may include the so-called "badges of fraud."

> In order to determine actual intent, based upon circumstantial evidence, many courts consider the following "badges of fraud":
>
>> (I) the lack of adequate consideration for the transfer; (ii) the family, friendship, or close relationship between the parties; (iii) the retention of possession, benefit, or use of the property in question by the debtor; (iv) the financial condition of the party sought to be charged prior to and after the transaction in question; (v) the conveyance of all of the debtor's property; (vi) the secrecy of the conveyance; (vii) the existence or cumulative effect of a pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency or threat of suit by creditors; and (viii) the general chronology of events and transactions under inquiry.
>
> [*E. Diversified Distrib., Inc. v. Matus* (*In re*] *Matus*[)], 303 B.R. [660,] 672-73 [(Bankr. N.D. Ga. 2004)]; *see also Stevenson v. Cutler* (*In re Cutler*), 291 B.R. 718, 723 (Bankr. E.D. Mich. 2003); *Nashville City Bank & Trust Co. v. Peery* (*In re Peery*), 40 B.R. 811, 815 (Bankr. M.D. Tenn. 1984). Additional factors indicating a debtor's actual intent include
>
>> whether the transaction is conducted at arm's length; whether the debtor is aware of the existence of a significant judgment or over-due debt; whether a creditor is in hot pursuit of its judgment or claim and whether the debtor knows this; and the timing of the transfer relative to the filing of the petition.

51

> *Adamson v. Bernier* (*In re Bernier*), 282 B.R. 773, 781 (Bankr. D.
> Del. 2002). If the plaintiff establishes the existence of badges of
> fraud, the burden shifts to the debtor to rebut the presumption.
> *Village of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th
> Cir.2002); *see also Peery*, 40 B.R. at 815 n. 6. Moreover, "[j]ust
> one wrongful act may be sufficient to show actual intent . . .
> [although] a continuing pattern of wrongful behavior is a stronger
> indication [thereof]." [*Hunter v. Sowers* (*In re*] *Sowers*[)], 229 B.R.
> [151,] 157 [(Bankr. N.D. Ohio 1998)].

*Gordon v. Courtney* (*In re Courtney*), 351 B.R. 491, 500 (Bankr. E.D. Tenn. 2006).

### 2. Bankruptcy Code § 727(a)(4)(A)

Section 727(a)(4)(A) of the Bankruptcy Code states:

> (a) The court shall grant the debtor a discharge, unless–
>
> (4) the debtor knowingly and fraudulently, in or in connection with the
> case--
>
>> (A) made a false oath or account[.]

11 U.S.C. § 727(a)(4)(A). The United States Court of Appeals for the Sixth Circuit has specified

the elements that the Plaintiff must prove, by a preponderance of the evidence under

§ 727(a)(4)(A). In *Keeney*, the court stated:

> In order to deny a debtor discharge under this section, a plaintiff
> must prove by a preponderance of the evidence that: 1) the debtor
> made a statement under oath; 2) the statement was false; 3) the
> debtor knew the statement was false; 4) the debtor made the
> statement with fraudulent intent; and 5) the statement related
> materially to the bankruptcy case.

227 F.3d at 685 (citations omitted).

With respect to the first element noted above, that the statement was made under oath,

statements made under penalty of perjury, such as Olivia's statements in her bankruptcy

schedules and SOFA, are considered to be under oath for purposes of § 727(a)(4)(A). *See Lim v.*

52

*Storozhenko* (*In re Storozhenko*), 487 B.R. 457, 466 (Bankr. E.D. Mich. 2012) (citing *Keeney*,

227 F.3d at 686 and 28 U.S.C. § 1746).

As for the fifth of these elements, materiality:

> The subject of a false oath is material if it "'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'"

*Keeney*, 227 F.3d at 686 (citations omitted).

As for the fourth of the *Keeney* elements, *i.e.*, the fraudulent intent element:

> "'Complete financial disclosure'" is a prerequisite to the privilege of discharge. . . . [I]ntent to defraud "involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." A reckless disregard as to whether a representation is true will also satisfy the intent requirement. "'[C]ourts may deduce fraudulent intent from all the facts and circumstances of a case." However, a debtor is entitled to discharge if false information is the result of mistake or inadvertence.

*Id.* at 685-86 (citations omitted).

This Court reiterates what it said about the fraudulent intent element, in the case of

*Beckerv. McInerney* (*In re McInerney*), 509 B.R. 109, 114-16 (Bankr. E.D. Mich. 2014):

> > [N]ot caring whether some representation is true or false—the state of mind known as "reckless disregard"—is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material.
>
> *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)(citations omitted).
> . . . .
>
> > In a recent bench opinion in *McDermott v. Schwenck (In re Schwenck)*, this Court interpreted *Keeney* as requiring the Court to

53

employ a "totality of circumstances" test to determine whether the "fraudulent intent" element of § 727(a)(4)(A) has been satisfied. (*See* Docket # 30 in Adv. Pro. No. 13-4701 (Tr. of Opinion on Trustee's Mot. for Summ. J.) at 14-17.) Under that test, a finding that a debtor had a "reckless disregard as to whether a representation is true," does not, standing alone, *require* the court to find that the "fraudulent intent requirement" of § 727(a)(4)(A) has been established. Rather, whether a debtor had a "reckless disregard as to whether a representation is true," is one factor among others that a court may consider in determining whether to draw an inference of fraudulent intent on the part of a debtor. *Id.* In other words, the Court *may*, but

> is not required to make a finding of fraudulent intent solely because the plaintiff has shown a reckless disregard by the debtor as to truth, ultimately it's all the facts and circumstance that the Court must consider to determine whether the debtor is guilty of actual fraudulent intent and fraudulent intent under *Keeney* . . . mean[s] actual intent to defraud, such as an actual intent by the debtor to conceal, for example, an asset that the debtor wants to keep . . . for his or herself and not lose to the administration of the bankruptcy case by disclosing it.

(*Id.* at 17.)

This Court interprets *Keeney* and similar cases as permitting, but not requiring, a finding of fraudulent intent if the debtor is guilty of reckless disregard for the truth. "[Fraudulent intent] can be found based on 'the cumulative effect of a series of innocent mistakes which evidence a pattern of reckless and cavalier disregard for the truth.'" *Sheehan & Associates PLC v. Lowe*, No. 12-11768, 2012 WL 3079251, at *7 (E.D. Mich. July 30, 2012)(citation omitted), *aff'd*, 518 Fed. Appx. 348 (6th Cir. March 22, 2013); *see also Beaubouef v. Beaubouef* (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir. 1992) (footnote omitted) (citation omitted) (holding that the bankruptcy court's findings "that the existence of more than one falsehood, together with [the debtor's] failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive [under § 727(a)(4)(A)]"

54

were "supported by the record and are not clearly erroneous"); *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 1987) (footnote omitted) (citation omitted) (holding that "there was ample evidence in the record to support a reasoned conclusion by the bankruptcy judge that [the debtor] exhibited the 'reckless indifference to the truth,' which has consistently been treated as the functional equivalent of fraud for purposes of §727(a)(4)(A)"); *Stevenson v. Taylor (In re Taylor)*, 461 B.R. 420, 423 (E.D. Mich. 2011) (quoting *Keeney*, 227 F.3d at 685-86)("The Sixth Circuit has provided that '"intent to defraud' involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression' [and] . . . '[a] reckless disregard as to whether a representation is true will also satisfy the intent requirement.'"); *Stevenson v. Cutler (In re Cutler)*, 291 B.R. 718, 726 (Bankr. E.D. Mich. 2003) (citation omitted) (explaining that "[a] series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive . . . [but that] the discharge is not to be denied when the untruth was the result of a mistake or inadvertence"); *March v. Sanders (In re Sanders)*, 128 B.R. 963, 972 (Bankr. W.D. La. 1991) (citations omitted) (explaining, in relevant part, that under § 727(a)(4)(A), "[t]he statement under oath must be known by its maker to be false and be made willfully (rather than inadvertently) with an intent to defraud"; that "[t]his intent [to defraud] may be established by circumstantial evidence"; and that "[s]tatements made with reckless indifference to the truth are regarded as intentionally false").

In an analogous context, in *Bullock v. Bankchampaign, N.A.*, 133 S. Ct. 1754, 1759 (2013), the United States Supreme Court recently held that "defalcation" under 11 U.S.C. § 523(a)(4) must be treated similarly to the way "fraud" is treated in that section; that fraud requires a showing of "positive fraud, or fraud in fact, involving moral turpitude or intentional wrong;" but that an intentional wrong includes "not only conduct that the fiduciary knows is improper, but also reckless conduct of the kind that the criminal law often treats as the equivalent [of an intentional wrong];" and that reckless conduct for purposes of § 523(a)(4) is when a "fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty"). *See also Shapiro v. Plante & Moran, LLP (In re Connolly North America, LLC)*, 376 B.R. 161, 184 (Bankr. E.D. Mich. 2007) (citations omitted) (discussing levels of

55

culpability in the context of a failure to comply with discovery obligations) ("'Reckless disregard' . . . is '[c]haracterized by the creation of a substantial and unjustifiable risk of harm to others, and by a conscious (and sometimes deliberate) disregard for or indifference to that risk.'")

## C. Application of law to the facts of these adversary proceedings

### 1. Denial of discharge based on § 727(a)(2)(A)

The Court finds and concludes that the Plaintiffs United States Trustee and Norman Wise have met their burden of proof for denying Defendant Olivia Wise's discharge based on § 727(a)(2)(A). Specifically, Plaintiffs have met their burden of proving, by a preponderance of the evidence, that Olivia's transfer of $250,000 of the Proceeds, from her credit union account to the IOLTA account of Chelsea Rebeck's law firm on August 10, 2016, was a transfer of Olivia's property, made within one year before the date of the filing of Olivia's bankruptcy petition, with intent to "hinder, delay, or defraud" a creditor (Norman Wise). For this reason, the Court must deny Olivia's discharge, based on § 727(a)(2)(A).

All of the § 727(a)(2)(A) elements are met with respect to the $250,000 transfer. First, just before Olivia made the transfer on August 10, 2016, the $250,000 was Olivia's property ("property of the debtor"). These funds were in Olivia's account at Vibe Credit Union, an account owned solely by Olivia, and over which Olivia had sole dominion and control. And these funds were part of the proceeds of Olivia's May 10, 2016 sale of the South Wilson Avenue Property, which property was, at the time of the sale, the sole property of Olivia (because of Norman's quit-claim deed transferring the property to Olivia). The $250,000 was part of the $371,819.38 in Proceeds from the sale of the property that were wire-transferred directly into Olivia's credit union account the day after the closing.

56

Norman claimed to be entitled to payment from Olivia of $250,000 of the Proceeds, promptly after the May 10, 2016 closing of the sale of the South Wilson Avenue Property. But this claim by Norman, based on his February 19, 2016 Agreement with Olivia, did not mean that the Proceeds, including the $250,000, were not Olivia's property at the time she transferred the $250,000 to the Rebeck law firm. Rather, at the time of the transfer, Norman was a creditor of Olivia's, with a lawsuit pending against her, but Norman was not the owner of the $250,000. Olivia was.

It is true that several months after the August 10, 2016 transfer, on February 1, 2017, Norman obtained order in the State Court Lawsuit which purported to impose a constructive trust on the entire $371,819.38 Proceeds. But that order did not purport to impose such constructive trust retroactively, effective as of any date prior to the date of the order. To the contrary, the February 1, 2017 order merely stated that the Proceeds "are hereby held in a constructive trust," and ordered Olivia to pay the Proceeds "into court pending the final disposition of this action."[158] And even if the state court order had purported to find or retroactively order that the Proceeds were held in a constructive trust as of August 10, 2016 or earlier (which it clearly did not), the historic fact would remain that when Olivia transferred the $250,000 on August 10, 2016, it was at that moment still her property.

Olivia, in substance, has admitted that the $250,000 in Proceeds that she transferred to the Rebeck law firm was a transfer of Olivia's property. Among other ways Olivia has admitted this are these: (1) as stated in Part III.A.3 of this Opinion, Olivia testified that after the closing of the South Wilson Avenue Property the sale Proceeds belonged entirely to her, not to Norman; (2)

_____

[158] The order is quoted in Part III.A.4 of this Opinion.

57

Olivia testified specifically that the $250,000 that she transferred did not belong to her father, but rather, she said, it was "mine;"[159] and (3) as described in Part III.A.11 of this Opinion, in an amended Schedule A/B that Olivia filed on November 22, 2017 in her bankruptcy case, Olivia disclosed as part of her "financial assets" the $33,768.71 of the Proceeds that was still held by the Rebeck law firm as of the bankruptcy petition date, which were "subsequently paid to the [Chapter 7] trustee." In this disclosure, Olivia referred to these funds as "an asset of the Debtor as of the petition date."[160] These statements in her amended Schedule A/B are implicit admissions by Olivia that the Proceeds from her sale of the South Wilson Avenue Property were property of Olivia, not Norman. Certainly, then, the $250,000 of the Proceeds were property of Olivia when she transferred them to the Rebeck law firm on August 10, 2016.

Second, Olivia's action in moving the $250,000 from her credit union account into the IOLTA account of the Rebeck law firm was both a "transfer" and a "concealment" of those funds. It was a transfer under the Bankruptcy Code's broad definition of transfer, discussed in Part III.B.1.b of this Opinion, because Olivia transferred title, possession, and control of these funds, from Olivia's credit union account to the Rebeck law firm's trust account. Once the funds were in the Rebeck law firm's trust account, Olivia no longer had title to them, no longer had possession of them, and no longer had sole and direct control of them. After the transfer, only Rebeck, through her law firm, had control of the funds, subject to the terms of the Revised Fee Agreement quoted in Part III.A.6.c of this Opinion.

---

[159] At trial, in testifying about the $250,000 transfer, Olivia was asked this: "So you think your father did have an interest in the funds at that point?" and she answered "As I said before, the money was mine." (Trial Tr. (Docket # 73) at 215).

[160] Docket # 102 in Case No. 17-45621 at pdf. p. 5, item # 35, and at pdf. p. 19.

Given the terms of that Revised Fee Agreement, the $250,000 was "an additional retainer" and thus, was subject to an attorney's lien to secure payment of attorney fees that Olivia incurred with the Rebeck law firm. And while Olivia could request and direct that disbursements be made from the funds, the disbursements were limited to "the following uses: Periodic billing by Attorney for representation, payment of tax liability-currently unknown amount, and as directed by client, in writing."[161] Therefore, while Olivia did retain some control of, and some interest in, the $250,000, it was limited by and subject to the terms of the Revised Fee Agreement. This was quite different from the sole and unfettered control and ownership of the funds that Olivia had before the transfer, when the funds were in the credit union account owned solely by Olivia.

Olivia's transfer of the $250,000 in Proceeds to the Rebeck law firm not only was a "transfer," but also was an act by which Olivia "concealed" the funds, within the meaning of § 727(a)(2)(A). As discussed in Part III.B.1.a of this Opinion, concealment includes "placing . . . assets beyond the reach of creditors;" "placing title to property in others' names and retaining beneficial interest." This is what Olivia did when she transferred the $250,000 to the Rebeck law firm's trust account.

Third, at the time of the transfer, Norman clearly was a "creditor" of Olivia. The Bankruptcy Code defines the term "creditor" to include an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor[.]" 11 U.S.C. § 101(10)(A). The term "claim," in turn, is defined very broadly, to mean:

> (A) right to payment, whether or not such right is reduced to

---

[161] PX 5 at pdf. p. 6.

> judgment, liquidated, unliquidated, fixed, contingent, matured,
> unmatured, disputed, undisputed, legal, equitable, secured, or
> unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such
> breach gives rise to a right to payment, whether or not such right to
> an equitable remedy is reduced to judgment, fixed, contingent,
> matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5). As this Court noted in *In re City of Detroit, Michigan,* 548 B.R. 748, 761

(Bankr. E.D. Mich. 2016),

> "Congress intended by this language [in 11 U.S.C. § 101(5)] to
> adopt the broadest available definition of 'claim,'" *Johnson v.
> Home State Bank*, 501 U.S. 78, 83 (1991) (citations omitted),
> which includes "'all legal obligations of the debtor, no matter how
> remote or contingent.'" *In re Huffy Corp.*, 424 B.R. 295, 301
> (Bankr. S.D. Ohio 2010) (quoting *Grady v. A.H. Robins Co., Inc.*,
> 839 F.2d 198, 200 (4th Cir. 1988)).

And as this Court recently discussed in the case of *Schubiner v. Zolman* (*In re Schubiner*), __

B.R. __, Adv. No. 17-4677, 2018 WL 4489454 (Bankr. E.D. Mich. Sept. 18, 2018), the United

States Supreme Court has held that the Bankruptcy Code definition of "claim" includes not only

an "enforceable obligation" but also an "unenforceable obligation." *Id.* at *13-15 (discussing

*Cohen v. De La Cruz*, 523 U.S. 213, 217-18 (1998) and *Midland Funding, LLC v. Johnson*, 137

S. Ct. 1407, 1412 (2017)).

At the time Olivia made the $250,000 transfer on August 10, 2016, Norman clearly had

one or more "claims" against Olivia, and therefore was a "creditor" of Olivia. Norman had, and

had asserted, claims against Olivia relating to the February 19, 2016 Agreement. And as

described in Part III.A.4 of this Opinion, Norman already had filed suit against Olivia on those

claims, on July 27, 2016, in the State Court Lawsuit. And in fact, Norman later prevailed on all

60

of his claims in the State Court Lawsuit, when he obtained the February 15, 2017 Default Judgment against Olivia, on all counts of his complaint.

Fourth and finally, Olivia made the $250,000 transfer (and act of concealment) "with intent to hinder, delay, or defraud" a creditor (Norman), within the meaning of § 727(a)(2)(A). Olivia did this with the intent to *hinder and delay* her creditor, Norman. As discussed in Part III.B.1.c of this Opinion, that is sufficient to establish the intent element under § 727(a)(2)(A). Intent to hinder means "an intent to impede or obstruct" a creditor or creditors, and intent to delay means "an intent to slow or postpone" a creditor or creditors. Put another way, "intent to hinder or delay" means to "act improperly to make it more difficult for a creditor to collect a debt." *See Wiggains*, quoted in Part III.B.1.d of this Opinion.

Olivia transferred the $250,000 to the Rebeck law firm with an intent to impede and obstruct, and an intent to slow or postpone, Norman's ability to collect the $250,000 or more that he claimed was due him from Olivia. And Olivia made the transfer with an intent to make it more difficult for Norman to collect on his claim against Olivia.

At trial, Olivia testified that when she made the transfer, the $250,000 she transferred to the Rebeck law firm was to be used primarily as a reserve of money that she could use to pay any tax liability she incurred from her sale of the South Wilson Avenue Property. At the time, according to Olivia, she and her attorney, Rebeck, were estimating that Olivia's tax liability could be $150,000 to $160,000.[162] Secondarily, the money was to be used to pay the attorney fees that Olivia incurred with Rebeck. The Revised Fee Agreement, which Olivia and Chelsea signed on July 5, 2016, reflected these two purposes as things the money could be used for, but it

---

[162] Trial Tr. (Docket # 73) at 215-16 (testimony of Olivia).

61

also allowed for the money to be disbursed, for *any* purpose, "as directed by [Olivia], in writing."[163]

It is clear that in order to serve these purported purposes, there was absolutely no legitimate need for Olivia to transfer any of the $250,000 from her own credit union account to the Rebeck law firm's trust account. Olivia could have kept all of that money in her own credit union account, and used it to pay her tax liability, if any, when the amount of that liability became known. And, of course, Olivia could have kept all the money that she may have wanted to use for any purpose other than paying her taxes in her own credit union account.

The evidence does not show that there was any need for Olivia to pay any additional retainer to Rebeck, above and beyond the initial retainer of $1,000.00 that she had paid to the Rebeck law firm, under the initial fee agreement Olivia made with Rebeck on May 23, 2016. Neither Olivia nor Rebeck testified that Rebeck had asked for, or required, any increased retainer from Olivia before the $250,000 transfer was made. Instead, both of them testified that Olivia requested to pay the $250,000 to the Rebeck law firm, not that it was demanded or requested in any way by Rebeck. And even if Rebeck had wanted Olivia to pay an increased retainer to secure payment of her fees (and there is no evidence of this), there certainly is no evidence that Rebeck would have wanted an increased security retainer in an amount anywhere near $250,000.

Given the evidence presented at trial, there simply is no logical, *legitimate* reason for Olivia to have paid the $250,000 to the Rebeck law firm. The Court finds that the only possible reason, and the only actual reason, for this transfer by Olivia, was Olivia's desire to do what she could to keep Norman from collecting this money. Olivia transferred the $250,000 in order to

---

[163] PX 5 at pdf. p. 6.

62

make it more difficult for Norman to collect on his claim against her, and to slow, impede, and obstruct Norman's effort to collect.

When Olivia made the Revised Fee Agreement with the Rebeck law firm, on July 5, 2016, providing for the $250,000 transfer, she knew that Norman and his attorneys had been demanding Olivia's payment of $250,000 of the Proceeds since shortly after the May 10, 2016 sale closing. When Olivia actually made the $250,000 transfer, on August 10, 2016, Norman had filed suit against her on July 27, 2016, and Olivia had been served with Norman's complaint on August 2, 2016.[164] So Olivia knew when she made the transfer that Norman's lawsuit was seeking not just the $250,000, but also a judgment for the entire $371,819.38 in Proceeds. And Norman's complaint was seeking an order "preventing [Olivia] from spending, transferring, encumbering, and/or disposing of any of the Proceeds during the pendency of this case." *See* Part III.A.4 of this Opinion.

Olivia actually admitted, in substance, that she made the $250,000 transfer to try to keep Norman from collecting this money. As quoted more fully in Part III.A.6.c of this Opinion, Olivia testified that she made the transfer because "[t]he $250,000 was the amount of money that my father had hoped to receive right away. And I felt given the eviction that that money should **be secured** . . .."[165] By "secured," here, Olivia clearly meant *secure from the possible reach of her father.*

Further evidence that Olivia's intent in making the $250,000 transfer was to hinder and delay her creditor-father is that during this same period, Olivia made other large transfers of the

---

[164]  Trial Tr. (Docket # 73) at 185 lines 6-24, 214 lines 4-9 (testimony of Olivia).

[165]  Trial Tr.  (Docket # 73) at 214 (testimony of Olivia) (emphasis added).

63

Proceeds of the sale of the South Wilson Avenue Property, which also appear to have been designed to put the money out of Norman's reach as a creditor of Olivia. Among these are (1) in late July 2016, Olivia used a total of $48,000 of the Proceeds to fund the purchase of the Minivan, but then titled the Minivan jointly in her name and her mother's name, even though Olivia's mother, who had been divorced from Norman for years, contributed nothing toward the purchase price of the vehicle; (2) in August 2016, Olivia made two payments to her mother, from the Proceeds, totaling $32,500, purportedly related to Olivia and her children living in her mother's basement, which included several months' worth of pre-paid rent and money to pay for improvements to her mother's home. *See* Parts III.A.6.a and III.A.6.b of this Opinion.

The transfers, when combined with the $250,000 transfer, totaled $330,500.00, or 89% of the total $371,819.38 Proceeds.

Based on the above facts and evidence, and for the reasons stated above, the Court finds and concludes that Olivia made the $250,000 transfer with the intent to hinder and delay Norman, a creditor. Based on this, the Court will deny Olivia's discharge under 11 U.S.C. § 727(a)(2)(A).

## 2. Denial of discharge based on § 727(a)(4)(A)

In Part III.A.11 of this Opinion, the Court describes in detail the large number of false statements that Olivia made in her schedules and SOFA that she filed on April 14, 2017 in her second (current) bankruptcy case. In Part III.B.2 of this Opinion, the Court describes the five elements that the Plaintiffs must prove, by a preponderance of the evidence, in order for the Court to deny Olivia's discharge under the "false oath" provision of § 727(a)(4)(A). These are the elements stated by the Sixth Circuit in the *Keeney* case.

64

Initially, the Court finds that Plaintiffs have proven, by a preponderance of the evidence, *Keeney* element nos. 1, 2, and 5, with respect to every one of the false statements identified by the Court in Part III.A.11 of this Opinion. Thus, the Court finds and concludes that as to every such false statement, Olivia made the statement under oath; the statement was false; and the statement related materially to the bankruptcy case (as materiality is defined by *Keeney*).

As to each false statement, that leaves *Keeney* elements 3 and 4 — *i.e.*, that Olivia "knew the statement was false" and that Olivia "made the statement with fraudulent intent." The Plaintiffs have proven *Keeney* element 3 by a preponderance of the evidence, and the Court finds that with respect to every one of the Olivia's false statements identified in Part III.A.11 of this Opinion, with the possible exception of those listed as nos. 19 and 20, Olivia knew the statement was false when she made it.

As to *Keeney* element 4, the Plaintiffs have proven, by a preponderance of the evidence, that Olivia made *at least* several of the false statements with fraudulent intent. The Court finds that Olivia made each of the following false statements with fraudulent intent: the false statements identified in Part III.A.11 of this Opinion, at Nos. 1, 3, 4, 5, 6, 9, 10, 16, 17, and 18.

Initially, the Court finds from the very large number of false statements that Olivia made in her schedules and SOFA, described in Part III.A.11 of this Opinion, that Olivia is guilty, at a minimum, of a reckless disregard for the truth of the representations she made in those many false statements under oath.

Under the Sixth Circuit's decision in *Keeney*, quoted in Part III.B.2 of this Opinion, courts "may deduce fraudulent intent from all the facts and circumstances of a case," but a reckless disregard for the truth alone may raise an inference that Olivia made the false statements

65

with fraudulent intent. *See Keeney*, 227 F.3d at 685-86 (internal quotation marks and citations omitted) ("A reckless disregard as to whether a representation is true will also satisfy the intent requirement."). As the court stated in *Stevenson v. Cutler (In re Cutler)*, 291 B.R. 718, 726 (Bankr. E.D. Mich. 2003),

> "[S]ince defendants will rarely admit their fraudulent intent, actual intent may be inferred from circumstantial evidence. *Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 123 (M.D.Fla.1991). **A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive.** *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992)."

(emphasis added) (quoting *Rouse v. Stanke (In re Stanke)*, 234 B.R. 449, 458 (Bankr.W.D. Mo.1999)); *see also Lewis v. Summers (In re Summers)*, 320 B.R. 630, 643, (Bankr. E.D. Mich. 2005) (same, and holding that "[a]lthough any one of the specific inaccuracies in the Schedules and Statement of Financial Affairs may not by itself seem material, the cumulative effect of these misstatements gives rise to an inference in this case that Debtor knowingly and fraudulently made a false oath or account.")

In addition to the pattern and sheer number of Olivia's false statements, the following circumstances further support the Court's finding that Olivia made the false statements with fraudulent intent.

Olivia is a well-educated person, and is very intelligent. She is a certified public accountant, and in the past she was a *certified fraud examiner*.[166] In her past work history while living in California, Olivia worked as a bookkeeper and accountant for small businesses, and her

---

[166] Trial Tr. (Docket # 73) at 149-50 (testimony of Olivia).

66

work included preparing business property tax returns and payroll tax returns.[167]  By her education, training, and experience, all of which have involved careful attention to detail, and given her very high level of intelligence, Olivia is not a person who could have made so many false statements in her schedules and SOFA *inadvertently*, or by innocent mistake.  Nor is she someone who could have overlooked, or failed to read and understand, the questions on the forms for her schedules and SOFA.

Furthermore, Olivia had ample time to supply information for her schedules and SOFA, and to review the drafts and completed versions of those forms, before they were filed with the Court.  While it is true that Olivia's first bankruptcy case was filed on an emergency basis, on March 16, 2018, that case was dismissed 11 days after it was filed, before Olivia ever had to file any schedules or a SOFA.  Olivia did not file her second bankruptcy case until April 14, 2018, which is also the day she filed her schedules and SOFA.  So Olivia had almost a full month after she first decided to file bankruptcy, to prepare, review, and file her schedules and SOFA.  And Olivia could have had even more time — an additional 14 days after the April 14, 2017 petition date — to file those documents in her bankruptcy case, if she had felt she needed more time.  And Olivia had the assistance of her attorney, Bert Whitehead, IV, during that entire time, as well as the help of administrative staff at the Rebeck law firm, to help her prepare her schedules and SOFA.

Olivia testified that she reviewed her schedules and SOFA before they were filed.  The many false statements on those forms must have been obvious to Olivia.  She could not help but notice many, if not all, of them.  Yet she filed the false schedules and false SOFA with the Court.

---

[167]  *Id.* at 150-51.

The Court's finding of Olivia's fraudulent intent, in making the false statements identified above, is also supported by the fact that Olivia had a motive for making each of those false statements. All of these false statements were in the nature of Olivia's failure to disclose her assets or failure to disclose the large transfers of money or other assets that Olivia made during the one year before she filed bankruptcy. Several of the transfers were made to Olivia's mother. And, as the Court has found, a very large transfer ($250,000) was made by Olivia with the intent of hindering and delaying a creditor (her father, Norman). Given all of this, Olivia likely wanted to shield the assets involved, and shield herself and her mother, from scrutiny by a bankruptcy trustee.

Another fact that strongly supports the Court's finding of fraudulent intent is that Olivia knew the true, undisclosed facts that made her statements false when she made them, with the possible exception of the false statements described at Item Nos. 19 and 20 in Part III.A.11 of this Opinion. In other words, Olivia knew that her false statements were false when she made them. And this raises a strong inference that Olivia made the false statements with fraudulent intent, rather than merely as inadvertent errors.

One specific example of this is Olivia's failure to disclose that the Rebeck law firm was holding funds in its client trust account that belonged to Olivia. Of the $250,000 that Olivia transferred to the Rebeck law firm's trust account on August 10, 2016, there was almost $34,000 left as of the April 14, 2017 petition date. Olivia admitted at trial that those funds were hers, and that she was aware that the Rebeck law firm was still holding funds of hers, when she filed her bankruptcy schedules and SOFA on April 14, 2017.[168] Olivia also testified that when she filed

---

[168] Trial Tr. (Docket # 72) at 47 (testimony of Olivia).

her schedules and SOFA, she did not know how much of the funds were left in the Rebeck law firm trust account,[169] and that she "was not thinking about" those funds when the schedules were prepared.[170]

This last bit of testimony is simply not credible. When Olivia filed her false schedules and SOFA on April 14, 2017, she had been reminded *very recently* about the funds she had in the Rebeck law firm trust account. First, as described in Part III.A.7 of this Opinion, Olivia attended the hearing in the State Court Lawsuit on March 15, 2017, and therefore was present when her attorneys Sara Allen and Chelsea Rebeck told the state court judge that there were still funds from the Proceeds being held in the Rebeck law firm's trust account. And as described in Part III.A.6 of this Opinion, soon after the March 15, 2017 state court hearing, Olivia asked for and received disbursements from the Rebeck law firm trust account, on March 30, 2017 and on April 11, 2017, each time in the amount of $3,000.00. Olivia requested and received these disbursements very shortly before she filed her false schedules and SOFA, in which she failed to disclose anything about her funds in the Rebeck law firm trust account. The April 11, 2017 disbursement to Olivia, in fact, occurred only 3 days before Olivia filed her second bankruptcy case and her false schedules and false SOFA, on April 14, 2017.

At trial, Olivia argued that she did not make the many false statements with fraudulent intent, but rather because of innocent mistakes and because of her stress and emotional turmoil. Olivia also complained that the bankruptcy software that she worked with at the Rebeck firm was

---

[169] Olivia admitted that she could have determined how much of her funds were left in the Rebeck law firm trust account, but says she took no steps to try to determine this. (*See* Trial Tr. (Docket # 72) at 139-40 (testimony of Olivia))

[170] *Id.* at 47-48.

difficult to use. The Court finds that these arguments are not persuasive, and are not supported by credible evidence.

Olivia may well have had a good deal of stress and emotional turmoil, at times, during the year or so before her bankruptcy. But there is no credible, persuasive evidence that Olivia's stress or emotional turmoil actually prevented or hindered Olivia from filing truthful, accurate schedules and SOFA. Moreover, during the month or so before the filing of Olivia's second bankruptcy case on April 14, 2017, Olivia had plenty of time and opportunity to work with her attorney and prepare her schedules and SOFA, and to prepare them accurately.

For all of these reasons, the Court finds and concludes, based on a preponderance of the evidence, that Olivia made false oaths satisfying all of the *Keeney* elements under § 727(a)(4)(A), including fraudulent intent, with respect to all of the false statements identified in Part III.A.11 of this Opinion, at Nos. 1, 3, 4, 5, 6, 9, 10, 16, 17, and 18.

Based on this, the Court will deny Olivia's discharge under 11 U.S.C. § 727(a)(4)(A).

**D. The remaining Counts in Plaintiff Norman Wise's Complaint are moot.**

The decision of the Court to enter a judgment in favor of Plaintiff Norman Wise and against the Debtor Defendant Olivia Wise in Adversary Proceeding Number 17-4534, denying Olivia Wise a discharge based on 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(4)(A) (Counts IV and VI of Plaintiff's Complaint), renders moot the remaining counts in Norman's Complaint (which are based on §§ 727(a)(3), 727(a)(5), 726(a)(6), 523(a)(2)(A), and 523(a)(6)). This is so because Norman now has received the dischargeability-related relief he was seeking in this adversary proceeding (namely, that Olivia's debt to Norman will not be discharged in Olivia's Chapter 7 bankruptcy case).

Thus, the Court is no longer able to grant Plaintiff any meaningful relief in addition to what he has already received. *Cf. Rosenfeld v. Rosenfeld* (*In re Rosenfeld*), 535 B.R. 186, 193-96 (Bankr. E.D. Mich. 2015), *aff'd.*, 558 B.R. 825 (E.D. Mich. 2016), *aff'd.*, 698 F. App'x. 300 (6th Cir. 2017) (dismissing, for lack of jurisdiction, a creditor's adversary proceeding seeking an order denying the debtor a discharge under several provisions of 11 U.S.C. § 727(a), where the debtor's debt to the creditor was nondischargeable under 11 U.S.C. § 523(a)). For this reason, the Court will enter an order dismissing the remaining counts in Norman's adversary complaint, as moot.

## IV. Conclusion

Based on the findings of fact, conclusions of law, and the reasons stated in this Opinion, the Court will enter judgment for Plaintiff United States Trustee on Counts I and III of the Complaint in Adv. No. 17-4535, and will enter a  judgment denying Defendant Debtor's discharge, based on 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(4)(A). And the Court will enter a similar judgment for Plaintiff Norman Wise, on Counts IV and VI of his Complaint in Adv. No. 17-4534. The Court will dismiss all other Counts of Norman Wise's Complaint, as moot.

The entry of these judgments will conclude each of these adversary proceedings.


**Signed on September 28, 2018**



/s/ **Thomas J. Tucker**
_____
**Thomas J. Tucker**
**United States Bankruptcy Judge**